[No. S004695. Crim. No. 24659. May 31, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
DUANE HOLLOWAY, Defendant and Appellant.

COUNSEL

Louis N. Hiken, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, J. Robert Jibson and Raymond L. Brosterhous II, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**PANELLI, J.**—Defendant was convicted of the first degree murders (Pen. Code, § 187) of Diane Pencin and Debra Cimmino.[1] He was also convicted of burglary of the Pencin-Cimmino residence (§ 459) and attempted rape (§§ 664/261) of Debra Cimmino. Three special circumstance allegations under the 1978 death penalty law were found true: (1) murder of Pencin during the commission of burglary (§ 190.2, subd. (a)(17)(vii)); (2) murder

---

[1] Unless otherwise noted, all statutory references hereafter are to the Penal Code.

of Cimmino during the commission of attempted rape (§ 190.2, subd. (a)(17)(iii)); and (3) conviction in this proceeding of more than one offense of murder (§ 190.2, subd.(a)(3)). The jury fixed the punishment at death; the appeal is automatic. (Cal. Const., art. VI, § 11; § 1239.)

As explained hereafter, we conclude that the judgment of guilt must be reversed for jury misconduct. For guidance on retrial we nevertheless discuss the ruling on the motion to suppress defendant's statements to the police.

### GUILT PHASE FACTS

#### A. *Prosecution Case.*

Diane Pencin and her younger sister, Debra Cimmino (Debbie), lived together in a townhouse in Sacramento. Their parents, Mike and Lorie Cimmino, lived about one block away and kept in close touch with their daughters. The sisters were very security conscious; there was a burglar alarm in the residence, which included a panic button.

On Saturday, March 19, 1983, Diane and her father went to a movie together. About 11:30 p.m. that evening Lorie Cimmino talked to her daughter Debbie on the telephone and indicated that she might come over the next afternoon. She had a change of plans and did not go there on Sunday. Lorie Cimmino's telephone conversation was the last contact anyone had with the sisters.

On Monday, March 21, Connie Greer, a friend of Debbie Cimmino's, received a call from Debbie's employer asking if she knew where Debbie was. Greer drove over to the Pencin-Cimmino townhouse to look for Debbie. When she arrived she noticed Diane's car parked in front; this seemed strange since it was a workday. She also noticed that the Sunday and Monday newspapers were still lying on the walkway. After receiving no answer at the door and being unable to open it, Greer walked around to the carport where Debbie's car was parked. The car was unlocked. She opened the door and discovered Debbie Cimmino's body in the rear seat underneath a pile of blankets and clothing. Greer ran to her aunt's house nearby and called for help.

Connie Greer was present when fire department paramedics and sheriff's deputies arrived. The first deputy on the scene concluded that a homicide had been committed and summoned detectives. He then entered the townhouse to look for Diane Pencin. He discovered Diane's nude body on the bed in the rear bedroom; the corpse was in rigor and very cold.

Detective Machen handled the investigation of Debbie's car. No car keys were found in the car. The contents of Debbie's purse were strewn about the floor of the front passenger seat. There was a sandy footprint on the floor of the rear seat and a pair of black panties. Although a blue ski parka was covering the body, the victim was nude from the waist down. Her blouse was pushed up to the lower portion of her breasts. Other than bleeding from the nose there were no apparent signs of trauma on the victim.

The autopsy of Debbie Cimmino revealed that she had numerous defensive wounds on her hands. The cause of death was manual strangulation. Vaginal and rectal swabs revealed no evidence of sperm. There was a small injury or tear to the entrance of the vagina; there was also some bruising. The tearing had occurred within a few hours of the victim's death.

Detective Reed investigated the townhouse where Diane Pencin's body was found. There were no signs of forced entry. The telephone in the kitchen had been disconnected from the wall. Two knives were lying on the floor near the bed containing Diane's body. One knife had blood on it. Nothing in the house appeared to be missing, and there were no signs of a struggle. Both cords for the telephone in the bedroom were missing. Diane's body was lying naked on the bed; her pajamas were mixed up with the bedspread on the floor. Her body had multiple stab wounds, bruising on her ankles and marks on her neck.

The autopsy of Diane Pencin revealed that she had at least six stab wounds and two smaller puncture wounds. She was alive when the wounds were inflicted. There were ligature marks on her wrists and possibly on her throat. There were no signs of trauma to her genitalia, nor was there any sperm present. The cause of death was multiple stab wounds in association with strangulation.

The two victims' niece had spent Friday and Saturday, March 18 and 19, with the victims at their townhouse. She and Debbie had washed and cleaned the interior and exterior of Debbie's car on Saturday morning, March 19. Diane had driven her home about 3 p.m. that day.

On March 21, the day the bodies were found, detectives spoke to Robert Cruz, a friend of defendant's. Cruz had picked up defendant at his father's house about 4 p.m. on Saturday, March 19. They watched television and drank beer at Cruz's apartment until about 4 a.m. when Cruz drove defendant to defendant's father's house.

Around 8 a.m., Sunday, March 20, defendant called Cruz and told him that if anyone asked he was to say that he dropped defendant off at his

mother's house at 8 a.m. that day. Cruz told the requested lie when officers questioned him about defendant's whereabouts on Saturday night and Sunday morning. Later Cruz was troubled and discussed the situation with his work supervisor who in turn called the sheriff's office. Cruz then told the officers the truth. Cruz also called defendant and informed him that he had told the officers the truth.

Officers interviewed defendant about 7:25 p.m. on March 21, 1983. Defendant said he had met Debbie in junior high school, had written to her after he had left school, had visited with her at his father's house several times, but was not "in love" with her. On the afternoon of Saturday, March 19, defendant went with his friend Robert Cruz and spent the night at the latter's apartment. Cruz drove defendant to his mother's house about 7 a.m. on Sunday. Defendant said he had no idea why anyone would want to kill Debbie and Diane.

Defendant was interviewed again on March 22, 1983, after Robert Cruz had informed him that he had told the truth. This time defendant said Cruz had dropped him off at his father's house at 3 or 4 a.m. Nobody was there, so he walked to a store and tried to call his father and a friend. No one answered, so he walked to his mother's house. When passing the Chandler Street area (the victims' street), defendant heard the sound of breaking glass and a woman screaming. When he arrived at his mother's house he called Cruz and asked him to give the false story; defendant did not want to be connected with the scream and broken glass. Defendant said he had been in Debbie's house and car a number of times; the last time he was in her car was about a month before. He had been in the townhouse in early March. Defendant explained that he had scratches on his side and knees from playing handball. At the end of the interview defendant admitted he had gone to Debbie's house to use the telephone. Both sisters answered the door. He remembered nothing else except that Debbie was screaming in the carport.

An identification technician testified that defendant's fingerprints were found in the following places: (1) at four spots on the outside of Debbie's car; (2) inside the car on the backseat backrest; (3) on the telephone lying on the bed where Diane's body was found; and (4) on the doorjamb of the other bedroom.

B. *Defense Case.*

Defendant did not testify in his own behalf. A friend testified that on the day of defendant's arrest they had played a "high intensity" game of hand-

ball during which defendant may have scraped himself on the wall or the ground.

A friend of Debbie Cimmino, Chris Caico, testified that she and Debbie had a lesbian relationship that had broken up. The testimony was introduced by way of a court reporter reading aloud testimony given by Caico in an earlier hearing out of the presence of the jury.

## ISSUES

### A. *Jury Misconduct.*

Defendant contends that jury misconduct during the guilt phase of the trial requires reversal of the judgment. We reluctantly agree. When the misconduct came to light, defendant moved for a mistrial. The court denied it, as well as a later motion for new trial on the ground of jury misconduct.

At the beginning of the trial the court had admonished the jurors to refrain from reading newspaper articles or listening to other media reports about the case. The court warned the jurors about the possibility of a mistrial resulting from corruption by outside influences and urged them to do their best to avoid it.

In addition, the court and all counsel went to great lengths to ensure that the jurors did not hear any evidence about defendant's prior criminal history. Before jury selection the court ruled under Evidence Code section 352 that defendant's prior record would not be admissible at the guilt phase since the probative value was outweighed by the prejudicial effect of such evidence. The court also ruled that it would not be admissible under Evidence Code section 1101 and warned the parties to tread carefully around the subject.

Despite these efforts, it was discovered shortly after the jury returned its verdicts in the guilt phase that one of the jurors, Juror Beck, had read a newspaper article on January 23, 1985, the second day of trial, stating that defendant was on parole from prison after having served time for assaulting a Sacramento woman with a hammer. Juror Beck had known this information throughout the trial and, according to him, had kept it to himself until after the jurors had signed their guilt phase verdicts.

The information came to light when another juror, Juror Gravier, telephoned the court clerk on April 1, 1985, five days after the guilt verdicts had been returned, to report that one of the jurors had mentioned after deliberations had been completed that he had knowledge of a possible prior

record or something, but that he had been careful not to mention anything until after the deliberations.

After consulting with counsel, the court brought in Juror Gravier for further inquiry. Gravier stated that after the verdict forms had been signed but before the jury had been summoned to return to court, the jurors were conversing. Juror Beck had said to several other jurors that he was glad the deliberations were over because he had been afraid he might accidentally reveal that he had read that defendant had previously assaulted a woman with a hammer. Juror Gravier thought that the comment had been directed to Juror Baril.

The court then brought in Juror Beck for inquiry. Juror Beck stated that he had read a newspaper article indicating that defendant previously had been convicted of assaulting a woman with a hammer. After further investigation the parties were able to stipulate that the article was in the Sacramento Bee on January 23, 1985, after the prosecutor had made his opening statement. The *last* paragraph of the article read: "At the time of his arrest, Holloway was on parole from prison after serving time for assaulting a Sacramento woman with a hammer."

Beck said that at the time he read the article, he was aware of the court's admonition to refrain from reading press reports about the trial. He remembered thinking that he had "blown it," and he wished he had never seen the article. Nevertheless, he made no mention of having read the article until after the jury had finished its guilt phase deliberations.

Juror Baril was identified as one of the jurors to whom Juror Beck had been talking. Inquiry of her revealed that she remembered sitting next to Juror Beck after deliberations and hearing some speculation about what defendant had been doing since high school. She did not, however, remember any specific discussion.

Counsel agreed not to question any of the remaining nine jurors. Following argument by counsel, the court denied a motion for mistrial without prejudice.

Defendant raised the issue of jury misconduct again in his motion for a new trial. In discussing the motion, the court acknowledged that there were two questions: (1) Was it misconduct? (2) If so, was it prejudicial? Taking the second question first, the court focused on the impact of Juror Beck's communication of the information to the other jurors, noting that if the verdicts had changed thereafter, he would immediately have granted a mistrial. Turning to the first question, the court stated that it had found no

"support in cases or statute for saying that inadvertent reading is in and of itself misconduct." The court ended its rather rambling ruling with the statement: "I respectfully feel that there was probably no misconduct in any cognizable sense and there is preeminently no indication of prejudice to the defendant of anything that's been brought before me."

The court's ruling was erroneous in several respects. As we shall explain, it erred in finding that there was no misconduct. It also erred in its analysis of the question of prejudice by failing to consider the effect of having one juror sit through the entire trial with secret and improper knowledge of defendant's prior record. Although the court's general admonition against reading newspapers did not include an instruction to report any such activity, the court had asked Juror Beck during voir dire to let it know if Beck later remembered having read anything else about the crime.[2]

■ It is well settled that it is misconduct for a juror to read newspaper accounts of a case on which he is sitting, and the People so concede. (*People v. Lambright* (1964) 61 Cal.2d 482, 486 [39 Cal.Rptr. 209, 393 P.2d 409]; *People v. Wong Loung* (1911) 159 Cal. 520, 525-527 [114 P. 829]; *People v. Stokes* (1894) 103 Cal. 193, 196-200 [37 P. 207]; *People v. McCoy* (1886) 71 Cal. 395, 397 [12 P. 272].) "There is no doubt . . . that the reading of newspapers by jurors, while engaged in the trial of a cause, is an inattention to duty which ought to be promptly corrected; and if the newspaper contains any matter in connection with the subject-matter of the trial which would be at all likely to influence jurors in the performance of duty, the act would constitute ground for a motion for a new trial. Jurors in a criminal action are sworn to render a true verdict according to the evidence. They cannot, under the oath which they take, receive impressions from any other source." (*People v. McCoy, supra,* 71 Cal. at p. 397.)

■ It is equally well settled that such juror misconduct raises a presumption of prejudice that may be rebutted by proof that no prejudice actually resulted. (*People v. Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050]; *People v. Wong Loung, supra,* 159 Cal. at pp. 527-529; *People v. Conkling* (1896) 111 Cal. 616, 628 [44 P. 314].) As early as 1896, we said, "when misconduct of jurors is shown, it is presumed to be injurious to defendant, unless the contrary appears." (*People v.*

---

[2] During voir dire, Juror Beck had acknowledged having read or heard something about the crimes at the time they occurred, but said that he did not remember any details. As a result of this disclosure, the court explained: "If one juror were secretly operating on input that may be true or false that came from some hearsay that he got a year and a half ago, this wouldn't be quite fair to the system. Do you understand?" Beck responded, "Yes." During argument on the motion for a new trial, counsel and the court determined that Juror Beck's knowledge of defendant's parole history came from the January 23 article and not from any earlier media coverage.

*Conkling, supra,* 111 Cal. at p. 628.) We have long recognized the reason for this rule: "A juror is not allowed to say: 'I acknowledge to grave misconduct. I received evidence without the presence of the court, but those matters had no influence upon my mind when casting my vote in the jury-room.' The law, in its wisdom, does not allow a juror to purge himself in that way. It was said in *Woodward* v. *Leavitt,* 107 Mass. 466; 9 Am. Rep. 49: 'But, where evidence has been introduced tending to show that without authority of law, but without any fault of either party or his agent, a paper was communicated to the jury which might have influenced their minds, the testimony of the jurors is admissible to disprove that the paper was communicated to them, though not to show whether it did or did not influence their deliberations and decision. A juryman may testify to any facts bearing upon the question of the existence of the disturbing influence, but he cannot be permitted to testify how far that influence operated upon his mind.' " (*People* v. *Stokes, supra,* 103 Cal. at pp. 196-197.) That principle is now embodied in Evidence Code section 1150.

"The presumption of prejudice is an evidentiary aid to those parties who are able to establish serious misconduct of a type likely to have had an effect on the verdict or which deprived the complaining party of thorough consideration of his case, yet who are unable to establish by a preponderance of the evidence that actual prejudice occurred. The law thus recognizes the substantial barrier to proof of prejudice which Evidence Code section 1150 erects, and it seeks to lower that barrier somewhat." (*Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 416 [185 Cal.Rptr. 654, 650 P.2d 1171].)

█   Until recently it was unclear what standard should be applied in criminal cases to determine whether the presumption of prejudice has been rebutted. In *People* v. *Marshall, ante,* 907, at pages 950-951 [269 Cal.Rptr. 269, 790 P.2d 676], however, we held that the analysis set forth in the American Bar Association Standards for Criminal Justice should be followed. A verdict of guilty must be reversed or vacated "whenever . . . the court finds a substantial likelihood that the vote of one or more jurors was influenced by exposure to prejudicial matter relating to the defendant or to the case itself that was not part of the trial record on which the case was submitted to the jury." (2 ABA Standards for Criminal Justice, std. 8-3.7 (2d ed. 1980) p. 8.57.)

"The ultimate issue of influence on the juror is resolved by reference to the substantial likelihood test, an objective standard. In effect, the court must examine the extrajudicial material and then judge whether it is inherently likely to have influenced the juror." (2 ABA Standards for Criminal Justice, *supra,* std. 8-3.7, Commentary, p. 8.58.)

As we noted in *People* v. *Marshall, supra, ante,* at page 951, this prejudice analysis is different from and indeed less tolerant than the "harmless-error analysis" for ordinary error at trial: "The reason is as follows. Any deficiency that undermines the integrity of a trial—which requires a proceeding at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury—introduces the taint of fundamental unfairness and calls for reversal without consideration of actual prejudice. (See *Rose* v. *Clark* [(1985)] 478 U.S. [570,] 577-578 [92 L.Ed.2d 460, 470-471, 106 S.Ct. 3101].) Such a deficiency is threatened by jury misconduct. When the misconduct in question supports a finding that there is a substantial likelihood that at least one juror was impermissibly influenced to the defendant's detriment, we are compelled to conclude that the integrity of the trial was undermined: under such circumstances, we cannot conclude that the jury was impartial."

There are, of course, cases in which the presumed prejudice has been found rebutted. In *People* v. *Sutter* (1982) 134 Cal.App.3d 806, 820-821 [184 Cal.Rptr. 829], for example, the presumption of prejudice was found rebutted because the evidence from the juror's improper visit to the crime scene added nothing contradictory to the evidence at trial and there was no issue relating to the scene of the crime.

■■■ The present case, however, is an entirely different matter. There is no doubt that serious misconduct occurred, regardless of whether the reading of the article was inadvertent or intentional. (*People* v. *Andrews* (1983) 149 Cal.App.3d 358, 363 [196 Cal.Rptr. 796, 46 A.L.R.4th 1].) The content of the article was extremely prejudicial; it revealed information about defendant's prior criminal conduct that the court had ruled inadmissible because of its potential for prejudice. The court and counsel had gone to great lengths to avoid having the jury learn of defendant's prior conviction for having assaulted a woman with a hammer. Their efforts were to no avail as to one juror—a fact that they did not learn until after it was too late to take any curative steps.

The present situation is similar to that in *People* v. *Thomas* (1975) 47 Cal.App.3d 178 [120 Cal.Rptr. 637] and *People* v. *Andrews, supra,* 149 Cal.App.3d 358. In *Thomas,* several jurors read a newspaper article stating that a codefendant had pleaded guilty and been sentenced. The Court of Appeal held that the trial court should have granted the defense motion for a mistrial. In *Andrews,* a newspaper article stating that the codefendant had pleaded guilty was inadvertently sent to the jury room during deliberations and read by at least six jurors. The trial court refused to question the jury and denied a motion for a new trial. The Court of Appeal reversed, stating that the preferred procedure in such cases "is to question the jurors in

chambers to ascertain knowledge and prejudice, if any, to defendant and, based upon the information obtained, decide whether the proper remedy is admonishment, instruction or mistrial." (149 Cal.App.3d at p. 366.) Given the extremely prejudicial nature of the evidence improperly received, the record in *Thomas* and *Andrews* presented no basis for finding that the presumption of prejudice had been rebutted. The prejudicial nature of the inadmissible evidence set the cases apart from those in which the presumption of prejudice had been found rebutted by the inherently nonprejudicial value of the evidence improperly considered or where the court has admonished jurors to disregard such evidence. (See, e.g., *People* v. *Martinez* (1978) 82 Cal.App.3d 1, 25 [147 Cal.Rptr. 208] [jury's consideration of maps that duplicated evidence already before jury]; *People* v. *Reyes* (1974) 12 Cal.3d 486, 506-507 [116 Cal.Rptr. 217, 526 P.2d 225] [jury's receipt of victim's clothing, to which defense objection had been overruled, but which had not been moved into evidence].)

In attempting to rebut the presumption of prejudice in the present case, the People follow the reasoning employed by the trial court in denying the motion for a new trial. They argue that Juror Beck did not disclose the offending information to any other jurors before or during deliberations and that the court had carefully admonished the jury not to read or listen to media reports about the case. The argument misses the point. We agree that the 11 other jurors were not contaminated, but we cannot overlook the fact that 1 juror went through the entire guilt phase contaminated by knowledge of what had been judicially determined to be inadmissible and prejudicial information. His silence exacerbated matters because it prevented the court and counsel from taking any action to remedy the situation. Thus, the defense had no opportunity to request curative measures such as the replacement of the tainted juror with an alternate or a limiting instruction or admonition. (Cf. *People* v. *Craig* (1978) 86 Cal.App.3d 905, 919 [150 Cal.Rptr. 676] [immediate admonishment cured potential prejudice]; *People* v. *Harper* (1986) 186 Cal.App.3d 1420, 1426-1430 [231 Cal.Rptr. 414] [prompt admonition not to consider definitions from dictionary rebutted presumption of prejudice].) Instead, the defense went through the entire guilt phase thinking that the jury was unaware of defendant's prior record when in fact one juror had such knowledge. We cannot say at this point that Juror Beck's improper knowledge had no impact. Although we know he was not the foreperson of the jury, we do not know, and may not discover under Evidence Code section 1150, what, if any, influence the improper information had on Juror Beck or what influence he in turn had on the other jurors. (See *People* v. *Pierce* (1979) 24 Cal.3d 199, 209 [155 Cal.Rptr. 657, 595 P.2d 91].)

Under the circumstances, we are unable to conclude that the presumption of prejudice has been rebutted. Our conclusion might have been

different had the misconduct been revealed in time for the court to have taken corrective steps to cure it through admonition or by other prophylactic measures. It might also have been different if the information improperly obtained by Juror Beck had been less prejudicial. Here, however, the trial court had already determined that the very information obtained by Juror Beck was inadmissible at trial under Evidence Code section 352 because its probative value was outweighed by its prejudicial impact. Although we recognize that a court's *in limine* determination of prejudice is not the same as the determination that we must make on appeal, we find nothing on this record to dispel that assessment of prejudice. The entire case was tried on the premise that defendant's prior record was inadmissible. There was no voir dire about it, no limiting instructions were given, and the parties went to great effort to excise such references from defendant's extrajudicial statements. The court had no chance to take any curative measures because of Juror Beck's concealment of the misconduct. In such circumstances, we are unable to say that the juror misconduct did not prejudicially affect the outcome of the trial.

■ Defendant was entitled to be tried by 12, not 11, impartial and unprejudiced jurors. "Because a defendant charged with crime has a right to the unanimous verdict of 12 impartial jurors (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 265-266 [148 Cal.Rptr. 890, 583 P.2d 748]), it is settled that a conviction cannot stand if even a single juror has been improperly influenced." (*People* v. *Pierce, supra,* 24 Cal.3d at p. 208; see also *In re Stankewitz* (1985) 40 Cal.3d 391, 403 [220 Cal.Rptr. 382, 708 P.2d 1260].) ■ Accordingly, we hold that the judgment must be reversed for jury misconduct.

B. *Alleged Miranda Error.*

Because the issue will arise on retrial we address defendant's claim that the court erred in denying his motion to suppress statements he made to the police on March 21 and 22, 1983, and evidence derived therefrom. Defendant brought a common law motion to suppress alleging violation of his rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] for failure to give warnings before the March 21 interview and a section 1538.5 motion to suppress the March 21 and March 22 statements, along with those of Robert Cruz, as products of an illegal arrest.

At the hearing on the motion Lieutenant Hash testified that during the course of his investigation on March 21, after the bodies were discovered, he was informed that defendant may have been a boyfriend of one of the victims and also that he was an ex-convict. Hash learned that defendant was

on parole, and Detective Dean checked with the parole office in an attempt to locate defendant. Defendant's parole officer called Detective Dean to tell him defendant was in his office at that time for questioning. Dean said he wanted to talk to defendant and asked if he left directly, would it be possible "to have Mr. Holloway there when [he] arrived?" Dean testified that he did not tell the parole officer to hold, detain, or arrest defendant.

When Dean and Hash arrived at the parole office about 6:34 p.m., they found defendant seated and handcuffed. Lieutenant Hash was surprised to see the handcuffs and asked the parole officer to remove them. Hash explained that he would like to talk to defendant downtown, and defendant indicated that he understood and that he would voluntarily come to the sheriff's station. The officers offered defendant the option of driving himself there, but when defendant said he had come with a friend they told defendant they would give him a ride home afterward if his friend did not want to accompany him. Lieutenant Hash testified that defendant would have been free to leave if he had so desired.

Before taking defendant to the station, the officers patted him down for weapons. They put him in the backseat of the unmarked car, unhandcuffed. They arrived at the sheriff's station about 7 p.m. and interviewed defendant for about two hours. Defendant was advised that he was not a suspect at that time. Lieutenant Hash testified that they did not think they had probable cause to arrest defendant, but that defendant was a suspect in the same sense that many people were at that point. During this interview defendant gave his alibi involving Robert Cruz. At no time during the interview was defendant advised of his *Miranda* rights. Unbeknownst to defendant the interview was tape-recorded and broadcast over a "squawk box." Defendant agreed to take a polygraph examination and provide a set of fingerprints. Defendant was given *Miranda* warnings before taking the polygraph examination. Defendant's alibi was corroborated, his polygraph examination indicated no deception, and defendant was driven home about 1 a.m., March 22.

Defendant testified that when he agreed to go downtown with the officers, he had not felt that he had a choice. When he was at the station he had not felt that he was free to leave the interview room and go home, and this was not due to the fact that he had no ride home.

Later that day, March 22, Lieutenant Hash went to defendant's home to speak to him about the false alibi he had asked Cruz to supply. They brought defendant's parole officer with them so they could conduct a parole search. Defendant said he had been trying to reach them and agreed to go with them to the sheriff's station. At the station defendant was advised of

his *Miranda* rights, which he waived. After being interviewed for five to six hours, defendant indicated that he wanted a lawyer. At that point he was advised of his *Miranda* rights again, he waived them again, and continued to talk. Lieutenant Hash testified that only during this second interview did he feel that he had probable cause to arrest defendant. Hash did not think the false alibi alone provided probable cause, but he did think there was probable cause after defendant's fingerprints were matched with those in the townhouse.

The trial court suppressed everything in the March 22 statement after defendant's initial indication that he desired an attorney. It ultimately denied suppression of the March 21 statement and the beginning portion of the March 22 statement. It did, however, order that the statements be sanitized to delete references to defendant's prior conviction, prison commitment, and parole.

In denying suppression of the March 21 statement and a portion of the March 22 statement, the court ruled that defendant had not been in custody for purposes of Fourth Amendment or Fifth Amendment protection. The court reasoned that the initial coerciveness arising from the parole officer's act of handcuffing defendant was attenuated by the officers' prompt request for removal of the handcuffs and their noninvolvement in the decision to handcuff defendant. The officers were not overbearing in any way, and though defendant testified that he had not felt he had a choice, he also testified that he had not seen any reason not to go. The court also noted that the questioning had been gentlemanly and not coercive.

Defendant contends that he was in custody for purposes of the Fourth and Fifth Amendments. He relies primarily on *People* v. *Boyer* (1989) 48 Cal.3d 247 [256 Cal Rptr. 96, 768 P.2d 610], contending that the facts of *Boyer* are strikingly similar to those here. We agree that there are similarities, but we find the situation here different in significant respects and affirm the trial court's ruling.

In *Boyer*, four police officers in plain clothes and unmarked cars went to the defendant's home seeking a voluntary interview. They deemed him a suspect but did not have probable cause to arrest him. Two officers were posted at the rear of the house to detain the defendant if he attempted to flee when the other two officers knocked at the front door. The defendant emerged from the back door after the officers knocked at the front door and spoke with a woman. The officers stopped the defendant, identified themselves and said that they would like to speak with him. The defendant agreed to come to the police station for an interview and was accompanied by officers while he went in the house to change clothes. The defendant was

frisked and told to "have a seat" in the back of the car. It took an hour to drive to the station. At the station, the defendant was advised of his *Miranda* rights before commencement of the interview. The questioning was aggressive and accusatory, and the officers evaded the defendant's questions regarding whether he was under arrest. We held that the circumstances amounted to an illegal arrest, noting the initial manner of accosting the defendant, the giving of *Miranda* warnings, and the accusatory questioning. (48 Cal.3d at pp. 267-268.)

■ The situation in the present case, by contrast, was considerably more benign and much less coercive. Leaving aside the initial handcuffing of defendant, for which the officers may not reasonably be held responsible, the circumstances of the officers' request for an interview did not carry the indicia of coercion that were present in *Boyer, supra,* 48 Cal.3d 247. Second, attention had not focused on defendant as a suspect; he was merely one of many persons being questioned. Third, no *Miranda* warnings were given since defendant was not considered a suspect. Fourth, the questioning was not aggressive or accusatory. These factors, in our view, serve to distinguish the situation from that in *Boyer* and convince us that the trial court was correct in concluding that defendant was not in custody for purposes of Fourth or Fifth Amendment protections at the time the challenged statements were made.

We believe the facts here are closer to those in *California* v. *Beheler* (1983) 463 U.S. 1121 [77 L.Ed.2d 1275, 103 S.Ct. 3517] and *Oregon* v. *Mathiason* (1977) 429 U.S. 492 [50 L.Ed.2d 714, 97 S.Ct. 711] than they are to *Boyer*. In both *Beheler* and *Mathiason*, the defendants agreed to come to the police station for an interview. Though they were suspects, they were told that they were not under arrest but that any statement they made would be evaluated by the district attorney. Both interviews lasted about 30 minutes, and the defendants then left. The United States Supreme Court held that neither defendant was "in custody" within the meaning of *Miranda*. The court noted that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it . . . . But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" (*Oregon* v. *Mathiason, supra,* 429 U.S. at p. 495 [50 L.Ed.2d at p. 719].)

■ In addition to the substantive challenge, defendant also challenges the trial court's ruling on procedural grounds. He contends the record is

inadequate because there were approximately five hours of argument on the merits in chambers that were not reported by the court reporter. There is, however, a stipulated settled statement as to the contents of the in-chambers discussion, which indicates it concerned legal arguments. Section 1181, subdivision 9 authorizes a reviewing court to order a new trial "because of the loss or destruction, in whole or in substantial part" of the reporter's notes. "The test is whether in light of all the circumstances it appears that the lost portion is 'substantial' in that it affects the ability of the reviewing court to conduct a meaningful review and the ability of the defendant to properly perfect his appeal." (*People* v. *Morales* (1979) 88 Cal.App.3d 259, 267 [151 Cal.Rptr. 610].) A settled statement may provide an adequate substitute. (*People* v. *Huff* (1978) 83 Cal.App.3d 549, 556 [147 Cal.Rptr. 316].) We find the settled statement adequate here and accordingly reject defendant's procedural challenge.

■ Defendant also contends that the unreported argument in chambers violated his right to be present at all stages of the proceedings pursuant to sections 977 and 1043. We disagree. Sections 977 and 1043 have been interpreted as not requiring the accused's personal presence either in chambers or bench discussions that occur outside of the jury's presence on questions of law or other matters in which the defendant's presence does not bear a "reasonably substantial relation to the fullness of his opportunity to defend against the charge." (*People* v. *Bloyd* (1987) 43 Cal.3d 333, 360 [233 Cal.Rptr. 368, 729 P.2d 802], internal quotation marks omitted.) Moreover, the burden is on the defendant to demonstrate that his absence prejudiced his case or denied him a fair trial. (*People* v. *Garrison* (1989) 47 Cal.3d 746, 783 [254 Cal.Rptr. 257, 765 P.2d 419].)

Defendant has not met his burden of showing prejudice. The settled statement reveals that the only matters discussed were legal arguments about the court's intended ruling, its ramifications, relevant authorities, and the question of which evidence was derivative. Given the nature of the discussion, defendant's presence was not necessary to protect his interests.

Defendant further contends that the court's ruling was based on improper considerations regarding the ramifications of suppression of the statements. The authorities he cites, however, do not support defendant's premise that it is improper for the court to consider the effect of its ruling on derivative evidence. The record shows that the court initially indicated that it intended to rule that the March 21 statement and the latter part of the March 22 statement were inadmissible. The court described its rambling ruling as "something in the nature of an announcement of intended decision." In the course of explaining its intended ruling, the court indicated that it was "bending over backwards to keep out pre-Mirandized state-

ments in order to fully protect the Defendant's rights." The prosecutor asked the court to look at *California* v. *Beheler, supra,* 463 U.S. 1121, before the court made a firm ruling. The court did so and then began a series of discussions with counsel in chambers regarding the derivative evidence that would be suppressed if the March 21 statement were suppressed. The prosecutor urged the court, in view of the ramifications of suppression of the March 21 statement, not to "bend over backwards" for defendant. After more on-the-record discussion, the court ultimately indicated that it had reconsidered its tentative position and had decided that the March 21 statement was admissible. No impropriety appears in the court's decisionmaking.

CONCLUSION

The judgment is reversed in its entirety.

Lucas, C. J., Broussard, J., Eagleson, J., Kennard, J., and Arabian, J., concurred.

**MOSK, J.,** Concurring—I concur in the judgment. I join the majority in concluding that prejudicial juror misconduct occurred at the guilt phase of defendant's trial.

Thereafter, I part company with them: there is no need to proceed further. On retrial, I am sure, the prosecution and defense will fully relitigate the claimed *Miranda* violations (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]). This is now inevitable since a majority held in *People* v. *Mattson, ante,* 826, at pages 848-869 [268 Cal.Rptr. 802, 789 P.2d 983], that a previous ruling by this court on the admissibility of evidence is not controlling on the trial court in a subsequent retrial. Therefore, whatever "guidance" is contained in the majority's discussion is likely to do little more than help the parties "prepare" their witnesses.