Filed 8/22/22  P. v. Youngs CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079542 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FVI20003103) |
| ALBERT CHANCELLOR YOUNGS, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Tony Raphael, Judge.  Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Daniel Rogers, Acting Assistant Attorney General, Alana Cohen Butler and Adrian R. Contreras, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Albert Chancellor Youngs, Jr. of attempted forcible oral copulation (Pen. Code, §§ 664, 287, subd. (c)(2)(A); count 4) and simple battery (Pen. Code, § 242; count 2), a lesser included offense of forcible oral

copulation. The jury found him not guilty of misdemeanor sexual battery (Pen. Code, § 243.4(e)(1); count 5), and the court dismissed the two sexual battery by restraint charges (Pen. Code, § 243.4(a), counts 1 & 3) In a bifurcated proceeding, Youngs admitted a serious felony allegation. The court sentenced him to 13 years in state prison.

Youngs contends the trial court prejudicially erred by (1) denying his mistrial motion; and (2) admitting under Evidence Code[1] sections 1109 and 352 testimony about his prior acts of domestic violence. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Youngs does not challenge the sufficiency of the evidence to support his convictions; therefore, we merely summarize the facts to provide context for his claims of prejudicial error.

*S.F.'s Testimony*

S.F. testified that she considered Youngs her stepfather because he had been married to her mother. One day in October 2020, when Youngs temporarily lived with S.F., she, a male friend, and Youngs were watching a movie in her bedroom. She was wearing pajamas and a pair of shorts. After the friend left, Youngs suddenly touched the back of S.F.'s neck. She saw him masturbating on the bed next to her. Youngs then grabbed her breast and the back of her neck and pulled her toward his penis, which her lips touched. She pushed off, sat up, and yelled at Youngs to stop because he was her stepfather. Youngs again pulled her neck toward his penis, but she pushed him off. S.F. hid in the bathroom for several minutes. When her friend returned, she left with him.

S.F.'s best friend learned about the incident and reported it to police, who interviewed S.F. three days after the incident.

---

[1] Undesignated references are to the Evidence Code.

*Youngs's Testimony*

Youngs testified on direct examination that he was in the bedroom with S.F. during the incident, and after S.F.'s friend left, he "reached" for S.F., and touched her "waist area." She protested that he was her stepfather, and ran and got dressed. Youngs denied exposing his penis to S.F. or forcing her head towards his genitals.

On cross-examination, the prosecutor questioned Youngs regarding his interview with police officers following the incident:

"[Prosecutor:] At some point in that interview where [two deputies] were asking you, 'Okay. So [S.F.] said no to what,' and you responded, 'To my advances,' right?

"[Youngs:] Yes, sir.

"[Prosecutor:] And another question was, 'To your [']advances[']? So what is it? So clarify to us, because maybe we can make a different determination if you would clarify with us what are your [']advances[']? Then your response was, 'I—I just—I—I—like well, one night I had my arms around her. We were laying there in bed. No, I wasn't really 'trying to do anything. I left it alone. And then—and then this night we were laying there, and yeah, homeboy left, and yeah, I tried to get with her, and she said no.' You said that, right?

"[Youngs:] Yes, sir.

"[Prosecutor:] And another question during that conversation with the deputies was, 'What do you mean? What, [']I tried to get with her[']? So define that.' Your response was, 'I was laying there in her bed, and—and, uh, she was in her—her night—her nighty thing, the like.' You said that, right?

"[Youngs:] Yes, sir.

3

"[Prosecutor:] And the next question was, 'Pajamas or something?' You responded, 'Yeah. Uh, so I—I just kind of assumed, and—and I reached for her, but I didn't—there was never—I didn't force myself on her. Like she said no.' You said that, right?

"[Youngs:] Yes, sir."

## I. *Mistrial Motion*

Youngs contends the trial court erroneously denied his motion for a mistrial following an unauthorized communication between a deputy sheriff, who was a witness as well as the People's designated investigator, and some jurors.

### A. *Background*

At the start of trial, the court instructed the jurors to avoid speaking with nonjurors about the trial.

On the first day of trial, the investigating deputy testified he had interviewed S.F. in the days following the incident, and later detained Youngs for questioning.

Following a recess that first day, defense counsel notified the court about potential juror misconduct involving the deputy. Outside of the jury's presence, the deputy testified that during a recess, several jurors were in the hallway talking among themselves about their not being paid for their time at the courthouse. Unbidden, the deputy jokingly told them they were getting paid for jury duty. A juror said they were not, and they all laughed. The deputy told them something like he had just finished a 20-hour graveyard shift.

The court next asked each juror individually about the conversation with the deputy. Eight jurors said they had heard the deputy talk to a group of jurors, and corroborated the deputy's account of the topic discussed. All

4

jurors stated the incident would not affect their ability to be fair and impartial, and they agreed to follow the court's instruction not to consider the interaction with the deputy in reaching a verdict.

Defense counsel moved for a mistrial: "I'd ask that every juror who either heard that conversation or was a part of that conversation be excused. And by my math, that's about 11 people, which leaves us with five jurors. [¶] So on that basis, I'd ask for a mistrial. I think this is inexcusable conduct by somebody who is trained and knows better and who's trying to improperly curry favor with the jury. So I think there's been prejudice here. I think Mr. Youngs is irreparably prejudiced by [the deputy's] conduct."

The prosecutor responded that a mistrial was unnecessary since the deputy did not discuss the facts of the case with the jurors, who all said they could set that incident aside and be fair and impartial.

The court denied the motion, ruling that that although the deputy's conduct was "highly inappropriate," the misconduct did not prejudice Youngs because the jurors said they could limit their verdict to the evidence presented in court. The court ordered the deputy excluded from the remainder of the trial.

The court reminded the jurors to disregard anything they observed outside of the courtroom. They indicated they could follow that instruction. The court instructed them to walk away if any party, attorney, or witness approached them to talk. The court further instructed them that the deputy's conduct was "inappropriate."

Before closing arguments, the court instructed the jurors with CALCRIM No. 222 that they "must disregard anything [they] saw or heard when the court was not in session, even if it was done or said by one of the parties or witnesses." It further instructed them to disregard what they saw

5

or heard during the incident with the deputy and not consider it for any reason.

B. *Applicable Law*

Penal Code section 1122, subdivision (a)(1) prohibits jurors from conversing "among themselves, or with anyone else, conduct research, or disseminate information on any subject connected with the trial." "[A]ny unauthorized communication between a juror and a nonjuror regarding the matter pending before the jury is misconduct and presumptively prejudicial." (*People v. Merriman* (2014) 60 Cal.4th 1, 98.) The prosecution must rebut the presumption by demonstrating "there is no substantial likelihood that any juror was improperly influenced to the defendant's detriment." (*People v. Clair* (1992) 2 Cal.4th 629, 668.)

"A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*People v. Haskett* (1982) 30 Cal.3d 841, 854.) "A motion for a mistrial should be granted when ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' " (*People v. Collins* (2010) 49 Cal.4th 175, 198–199.) On appeal, we apply the abuse of discretion standard in reviewing a trial court's denial of a motion for mistrial. (*People v. Davis* (2005) 36 Cal.4th 510, 553;.)

C. *Analysis*

We agree with the trial court that the deputy's conduct was "highly inappropriate." The misconduct in this case is akin to that in *People v. Stewart* (2004) 33 Cal.4th 425, 510, in which a juror asserted in a declaration: "2. During a break in the testimony of witness Jackie Coghlan, I saw Ms.

6

Coghlan in the ladies restroom; [¶] 3. While in the restroom, I said to Ms. Coghlan something to the effect of [¶] 'I know we're not suppose[d] to have any contact but I just wanted to tell you're [*sic*] a very nice looking (or attractive) lady.' [¶] 4. I have no idea what she said after that because I walked out the door. I know she said something back but I didn't hear it because I went out the door. [¶] 5. This brief contact did not in any way affect my ability to be fair and impartial in this case." The California Supreme Court described that misconduct as "a juror's technical violation of the court's admonition not to discuss the case with nonjurors [that] was ' "trifling' misconduct" ' that could not have prejudiced the defendant." (*People v. Merriman, supra,* 60 Cal.4th at p. 98.)

We conclude the court did not err by denying the mistrial motion because the prosecution rebutted the presumption of prejudice from juror misconduct. The court thoroughly investigated the incident by interviewing the deputy and each juror separately, and ascertained that the misconduct involved a brief conversation about a trifling topic unrelated to the merits of the case, between the deputy and some jurors. The court reminded the jurors of its instruction to base their decision solely on the evidence received in court and avoid talking to nonjurors during trial. We presume the jury followed the instructions. (*People v. Frederickson* (2020) 8 Cal.5th 963, 1026.) All jurors confirmed that the incident would not affect their ability to be fair and impartial. The court additionally removed the investigating officer from that role for the remainder of the trial, thus minimizing any prejudice to Youngs.

None of the cases Youngs cites lead us to a contrary conclusion because they either involved prejudicial misconduct, or the presumption of prejudice remained unrebutted: (*In re Hitchings* (1993) 6 Cal.4th 97, 123 [concluding a juror's "intentional concealment on voir dire of material information, as well

7

as her discussing the case with [a nonjuror] while a sitting juror, constituted jury misconduct and raised a presumption of prejudice that stands unrebutted by the evidence presented at the evidentiary hearing"]; *People v. Pierce* (1979) 24 Cal.3d 199, 207 [concluding that, "in derogation of his oath and his specific promise on voir dire not to engage in any such conversations," a juror discussed the merits of the case with the witness police officer who had investigated the case during trial]; *People v. Holloway* (1990) 50 Cal.3d 1098, 1106, 1110–1112 [finding prejudicial misconduct because during trial a juror had read a newspaper article stating that defendant was on parole from prison after having served time for assaulting a woman with a hammer]; *People v. Loot* (1998) 63 Cal.App.4th 694, 698 [concluding that although a juror committed misconduct in discussing the prosecutor's personal life, the resulting presumption of prejudice was rebutted].)

## II. *Prior Offenses Testimony*

Youngs contends that under sections 1109 and 352, the trial court erred by admitting (1) an officer's testimony regarding Youngs's prior domestic violence against victim A.A. and (2) S.F.'s statement repeating her mother's claim Youngs gave her mother a black eye in 2009-2010. Youngs adds that "the prior incidents were entirely dissimilar from the present alleged offenses, because they involved pure, generalized violence, rather than an actual or attempted sexual assault. As a result, the prior incidents had no relevance to and did not show any alleged "propensity" by [him] to engage in the kind of sexually predatory conduct alleged in this case. Further, evidence regarding the type of generalized violence alleged in the prior cases, in which [S.F.'s mother] received a black eye, and [Youngs] allegedly attacked [A.A.] with the leg of a table, was highly inflammatory and likely to prejudice

8

jurors." Youngs argues the incident involving S.F.'s mother was remote, as it occurred over a decade earlier.

A. *Background*

1. *Motions in Limine*

The prosecutor moved in limine to admit evidence of Youngs's prior domestic violence incidents with a woman named A.A., with whom he was in a two-year relationship, arguing they showed Youngs's propensity for inflicting domestic violence.

As to that incident, which occurred in June 2019, the People argued that a police officer responded to a residence regarding domestic violence. The officer observed A.A. with bruises on her shin, shoulder, and chin, and marks on her nose and forearm. A.A. shook and cried. The officer arrested Youngs for inflicting injury on a cohabitant. Youngs told police he and A.A. had an ongoing argument; however, he did not know how she got her bruises. He denied using a wooden table leg as a weapon. Youngs pleaded guilty of attempted false imprisonment.

Defense counsel argued the court should exclude evidence of this "dissimilar" incident, pointing out it was not a sex offense, unlike the charged offenses in the instant case. He also argued the evidence was overly prejudicial: "I think the [incident] was a crime of pure violence, just standard, no sex violence, whereas what Mr. Youngs is charged with is a purely sexual violent case, and the dissimilarities I think are too great under [section] 352."

The court granted the prosecutor's motion to admit evidence of this incident, finding Youngs, in the course of the false imprisonment of A.A., used the same type of "control" behavior as when he pushed S.F.'s face down during the alleged sexual assault. The court found this prior incident was

9

not remote; would not involve undue consumption of time because only two witnesses would testify; there was no risk of unfair prejudice because the charged offenses were more serious than Youngs's attempted false imprisonment; and the jury would not be confused because the uncharged incident involved a different victim. Accordingly, the officer testified regarding Youngs's 2019 domestic violence incident as set forth above.

S.F.'s testimony regarding the other domestic violence incident came to light after she was asked on direct examination why she did not call 911 after the incident with Youngs. She replied she was afraid, embarrassed and hurt. She feared that Youngs would do it again or hurt her if she told anyone. To provide context for that fear, the court allowed her to testify that one day in 2009 or 2010, she saw her mother with a black eye, and her mother said that following an altercation, Youngs had hit her.

During S.F.'s trial testimony about her mother's black eye, the court instructed the jurors that her mother's statement merely explained S.F.'s decision not to contact police: "[It is not] coming in for the truth of the matters asserted but to explain the subsequent conduct of the witness, S.F., as she explained earlier. You are only to consider it for that purpose and no other."

The court instructed the jury with CALCRIM No. 303: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other." It also instructed the jury with CALCRIM No. 852A that if the jury found the prior act with A.A. occurred then it may, but was not required to, conclude that Youngs was predisposed to commit domestic violence: "If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to

10

prove that the defendant is guilty of [the charged crimes]. The People must still prove each charge beyond a reasonable doubt."

2. *The Parties' Closing Arguments*

The prosecutor argued to the jury that the uncharged incident with A.A. proved Youngs was predisposed to commit acts of domestic violence to dominate his partners and force them to do his wishes. He argued S.F.'s mother's statement about the black eye caused S.F. to fear Youngs, and explained why S.F. did not initially report Young's sexual aggression to law enforcement.

Defense counsel argued the jury should base its verdict on the evidence of the charged offenses and not merely on his past convictions. He argued Youngs pleaded guilty to his prior crimes and took responsibility for his past mistakes. Defense counsel argued the previous domestic violence offense did not involve sexual violence, and S.F. was not afraid of Youngs, considering she had let him live with her.

B. *Applicable Law*

"Ordinarily, propensity evidence—evidence that a defendant committed an uncharged offense—is inadmissible to prove the defendant's disposition to commit the charged offense. (§ 1101, subd. (a).) Evidence that the defendant committed uncharged crimes or other acts, however, is admissible to prove relevant facts other than disposition, such as motive, intent, and absence of mistake or accident. (. . . § 1101, subd. (b).)" (*People v. Kerley* (2018) 23 Cal.App.5th 513, 531.) Section 1109 is yet another legislative carveout to this general rule against admitting propensity evidence and provides an exception in domestic violence cases. It states: "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible

11

by [s]ection 1101 if the evidence is not inadmissible pursuant to [s]ection 352." (§ 1109, subd. (a)(1).) "As a result, section 1109 'permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes.' " (*Kerley*, at p. 531.)

"[T]he California Legislature has determined the policy considerations favoring the exclusion of evidence of uncharged domestic violence offenses are outweighed in criminal domestic violence cases by the policy considerations favoring the admission of such evidence." (*People v. Johnson* (2000) 77 Cal.App.4th 410, 420.) Section 1109 thus " 'reflects the legislative judgment that in domestic violence cases . . . similar prior offenses are "uniquely probative" of guilt in a later accusation.' " (*Kerley*, *supra*, 23 Cal.App.5th at p. 531.)

Under section 352, the court must first determine whether the "probative value [of the evidence is] substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§§ 352, 1109.) The trial judge is in the best position to evaluate the evidence. (*People v. Hernandez* (2011) 200 Cal.App.4th 953, 966.)

"We review a challenge to a trial court's decision to admit [this] evidence for abuse of discretion." (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531.) "A trial court's exercise of its discretion under section 352 ' "must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Brown* (2000) 77 Cal.App.4th 1324, 1337.)

12

In applying section 352, " 'prejudicial' " is not synonymous with " ' "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.) Rather, evidence is unduly prejudicial under section 352 only if it "uniquely tends to evoke an emotional bias against the defendant as an individual and . . . has very little effect on the issues" (*ibid.*), or if it invites the jury to prejudge " 'a person or cause on the basis of extraneous factors.' " (*People v. Harris* (1998) 60 Cal.App.4th 727, 737.) "Painting a person faithfully is not, of itself, unfair." (*Ibid.*; *People v. Johnson, supra*, 185 Cal.App.4th at p. 534.)

C.   A*nalysis*

We conclude the court did not abuse its discretion under section 352 by admitting into evidence both S.F.'s testimony regarding her mother's black eye or the officer's testimony regarding the A.A. domestic violence incident. As it was required to do, the court analyzed the testimony for prejudice. It did not err in concluding the testimony did not involve undue consumption of time or prejudice to Youngs, and it was not confusing or misleading to the jury.

We also point out the court instructed the jury regarding the fact the testimony alone would not suffice to convict Youngs, and the scope of the jury's use of it. Accordingly, " 'Any prejudice that the challenged information may have threatened must be deemed to have been prevented by the court's limiting instruction to the jury. We presume that jurors comprehend and accept the court's directions.' " (*People v. Gutierrez* (2018) 28 Cal.App.5th 85, 91.)

We are unpersuaded by Youngs's attempts to argue the prior crimes and the charged ones were dissimilar, and to distinguish them on the grounds that the former involve "generalized violence," making their admission into evidence prejudicial because they would inflame the jury more

13

than the crimes against S.F. As the court ruled, both the prior and the charged crimes demonstrated that Youngs sought to control women physically, as he did in the A.A. incident for which he pleaded guilty to false imprisonment and as he did when he pulled S.F. by the neck and forced her head towards his penis. The Legislature in permitting the use of propensity evidence pointed out, "Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity." (See *People v. Johnson, supra,* 77 Cal.App.4th at p. 419.) We conclude Youngs's actions in the S.F. incident were arguably more impactful to the jury, as the victim herself testified Youngs used his position of age, trust, and authority as a stepfather to expose his genitals and perpetuate acts of sexual aggression against his stepdaughter. To protect herself, she had to escape to the bathroom in her own home, and only emerged when her friend returned. She was so scared she did not call police.

We conclude the court did not err by admitting S.F.'s statement about her mother's black eye for the limited purpose of showing the effect of that incident on S.F.'s decision not to report to the police Youngs's crimes against her. Her testimony was brief, not admitted for its truth, and no details beyond the fact of the altercation and Youngs's causing the mother's black eye were admitted. Thus the jury was unlikely to be prejudicially inflamed against Youngs.

As to Youngs's claim that the incident with S.F.'s mother, which occurred about a decade before the charged crime, was remote, we point out this evidence was not admitted under section 1109 subdivision (e), which provides that "[e]vidence of acts occurring more than 10 years before the

charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice."

In any event, although section 1109 establishes a presumption that domestic violence acts committed 10 years before the charged conduct is inadmissible, the statute also "clearly anticipates that some remote prior incidents will be deemed admissible and vests the courts with substantial discretion in setting an 'interest of justice' standard." (*People v. Johnson* (2010) 185 Cal.App.4th 520, 539.) "[T]he 'interest of justice' exception is met where the trial court engages in a balancing of factors for and against admission under section 352 and concludes that the evidence was 'more probative than prejudicial.' " (*Johnson,* at pp. 539–540.) "To the extent a higher degree of scrutiny is called for, it is the conclusion drawn from the balancing test, not the process itself, that must change under subdivision (e)." (*Id*. at p. 539.) Thus, under the "interest of justice" exception, evidence is admissible when the "probative value [of the prior acts] weighs more heavily on [the] same scales [as section 352]." (*Ibid*.) Accordingly, even if the subdivision (e) interest of justice exception applies, it is met here.

Youngs argues this was a close case, pointing out the jury acquitted him of one count, and the court dismissed two others. We interpret that result differently. It reflects the jury did not convict Youngs purely based on prejudice resulting from the prior incident with A.A.; rather, it reached its mixed verdict by carefully applying the law, including the jury instructions, to the facts. (*People v. Robertson* (2012) 208 Cal.App.4th 965, 995.)

DISPOSITION

The judgment is affirmed.

O'ROURKE, J.

WE CONCUR:


HUFFMAN, Acting P. J.



DO, J.