Filed 12/16/22  P. v. Cruz-Zepeda CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALEXIS CRUZ-ZEPEDA,<br><br>    Defendant and Appellant. | A161927<br><br>(San Francisco Super. Ct.<br>Nos. SCN231614 & CT17004253) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE DANIEL MEJIA-CARRILLO,<br><br>    Defendant and Appellant. | A162077<br><br>(San Francisco Super. Ct.<br>Nos. SCN231614 & CT17004252) |

In 2019, a jury convicted defendant Jose Daniel Mejia-Carrillo of a gang-related murder which took place in the Mission District of San Francisco. Mejia-Carrillo's codefendant, Alexis Cruz-Zepeda, was convicted of gang conspiracy (Pen. Code, § 182.5)[1] based on evidence that he acted as a lookout during the murder.

The trial court learned during deliberations that three jurors and two alternates had exchanged text messages about the case. Defendants

_____

[1] All undesignated statutory references are to the Penal Code.

1

immediately moved for a mistrial based on juror misconduct. The court agreed that the text message exchange constituted misconduct but found that the presumption of prejudice had been rebutted. The court denied defendants' motion for a mistrial and directed the jurors to continue deliberating. The jury returned a unanimous verdict less than two hours later. The court denied each defendant's motion for a new trial based on juror misconduct.

In these consolidated appeals,[2] defendants argue that the judgments must be reversed because the trial court's investigation into the jury misconduct was inadequate and because the misconduct constituted error which is reversible per se or resulted in a presumption of prejudice that was not rebutted. We find no error in the denial of defendants' motions for a mistrial or their motions for a new trial.

While the appeals were pending, the Legislature enacted Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 699, §§ 1–5) (Assembly Bill 333), which, effective January 1, 2022, significantly altered substantive and procedural elements of gang-related prosecutions. Mejia-Carrillo argues that the jury's true finding that he violated section 186.22, subdivision (b)(1), (referred to herein as the gang enhancement) must be reversed and remanded because the provisions of Assembly Bill 333 apply retroactively. Cruz-Zepeda argues that his conviction for gang conspiracy under section 182.5 must be reversed and remanded for the same reason. The Attorney General agrees that the gang enhancement in Mejia-Carrillo's case must be vacated, and that the district attorney should be allowed on remand to decide whether to retry the enhancement. However, he takes a different position on

---

[2] On January 22, 2021, we granted the Attorney General's unopposed motion to consolidate the appeals.

2

Cruz-Zepeda's conviction for gang conspiracy, arguing that because section 182.5 was originally adopted by voter initiative, which required a two-thirds legislative majority to amend, Assembly Bill 333's amendments to section 186.22, subdivisions (e) and (f), which apply retroactively in other situations, do not apply retroactively when incorporated as part of section 182.5.

We conclude that Assembly Bill 333 is retroactive for both defendants. We reverse the true finding on Mejia-Carrillo's gang enhancement (§ 186.22, subd. (b)(1)), reverse Cruz-Zepeda's conviction for gang conspiracy (§ 182.5), and remand both matters to afford the district attorney an opportunity to retry the issues under current law.

## BACKGROUND

The operative pleading in this case charged Mejia-Carrillo in count 1 with murder (§ 187, subd. (a)) and enhancements for the intentional discharge of a firearm causing death (§ 12022.53, subd. (d)) and acting for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)); in count 2 with possession of a firearm by a felon (§ 29800, subd. (a)(1)); and in count 3 with participation in a criminal street gang (§ 186.22, subd. (a)). Cruz-Zepeda was charged in count 4 with gang conspiracy. (§ 182.5.)

The matter was tried over a four-week period in November and December 2019. At the conclusion of the presentation of evidence, the trial court granted Mejia-Carrillo's oral motion for an acquittal[3] on count 3. The matter was submitted to the jury on December 16, 2019. After deliberating for approximately 12 to 13 hours over four days, the jury returned guilty verdicts on all remaining charges and true findings on the enhancements.

---

[3] Section 1118.1 authorizes a defendant to move at the close of evidence and before the cause is submitted to the jury for "a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction[.]"

3

## A. Jury Trial

### (1) Evidence Presented

Sergeant Robert Trujillo was designated a prosecution expert "in the area of criminal street gangs, specifically, Latin gangs." He described the origins and characteristics of M.S. 13, a Sureño gang comprised of El Salvadoran refugees which began in Los Angeles in the late 1970's or early 1980's. Trujillo opined that the defendants were members of "20th Street," a subset or clique of M.S. 13, based in the Mission District of San Francisco, primarily "in the area of 20th and Mission, Dolores Park."

On March 16, 2017, between 10:30 p.m. and 11:30 p.m., George Martinez, his son, and his son's girlfriend stopped at the Beauty Bar on the corner of 19th Street and Mission Street in San Francisco to celebrate Martinez's birthday. Trujillo testified that the bar is located "inside 20th Street clique M.S. 13 territory," and is a "frequent place for M.S. 13 gang members, 20th Street members [to] hang out . . . ." Three members of 20th Street were at the bar that night: Elmer Rodriguez, Mejia-Carrillo, and Cruz-Zepeda.

The bar was lively, and Martinez was in a good mood. He wandered around the bar and interacted with other patrons. Martinez spoke to Christian,[4] who was celebrating the end of his college examinations. Martinez was also "going up and talking and making physical contact" with Elmer Rodriguez. Trujillo opined that Martinez's conduct would be perceived by members of M.S. 13 as "a sign of disrespect to be that close to [Rodriguez.]" After Martinez moved away, Elmer Rodriguez briefly interacted with Cruz-

---

[4] The parties agreed, and the trial court subsequently ordered, that certain prosecution witnesses would be referred to by their first names only. Based on the parties' stipulation, we refer to witnesses Christian and Michael by their first names.

Zepeda.  Cruz-Zepeda immediately walked outside to wait in the street outside the Beauty Bar.

Sometime after midnight, Christian and Martinez left the bar together to find cigarettes.  Unbeknownst to them, Mejia-Carrillo followed them out of the bar.  The two men walked down 19th Street towards Christian's car.  Cruz-Zepeda, who was still waiting outside the bar, quickly crouched down in the street behind a garbage can.  Cruz-Zepeda stood up as Mejia-Carrillo passed his location and began slowly walking after him.

When Christian and Martinez reached the car, both men got into the back seat.  Mejia-Carrillo walked past Christian's car and stopped in the street about a car length away.  As Cruz-Zepeda approached the car, Christian noticed that he was smoking a cigarette and suggested that Martinez ask the man to give them one.  Martinez stepped out of the car and asked Cruz-Zepeda for a cigarette; Cruz-Zepeda appeared startled and took a step back.  Mejia-Carrillo quickly stepped forward, asked Martinez in a hostile voice where he was from, and demanded to know if Martinez was a Norteño.

Trujillo explained that Mejia-Carrillo's confrontation with Martinez was a "gang check," which he described as a gang member approaching a perceived rival and demanding to know "where are you from or what do you claim?"  The purpose of a "gang check" inside of M.S. 13 territory is to "reaffirm that that is the territory that they control.  They don't want anyone that they don't know in their territory . . . and they want to make sure that they address those individuals in their territory."  Trujillo testified that

Mejia-Carrillo's questions were actually accusations because "[t]hey already knew what they were going to do."[5]

Seconds later, Mejia-Carrillo shot Martinez twice with a handgun. Martinez died that evening at San Francisco General Hospital.

James heard the gunshots as he was walking towards the corner of Capp Street and 19th Street. James saw a man running at full speed in his direction, possibly wearing a black hoodie. When he rounded the corner, James saw Martinez lying face down on the ground.

Michael heard the gunshots from his apartment above the Beauty Bar. From this vantage point, Michael saw Martinez on the ground and noticed a person hiding in the back seat of a white car. After the person popped out of the car and ran off, Michael called the police, who arrived within a few minutes.

Mejia-Carrillo and Cruz-Zepeda fled after the shooting. Mejia-Carrillo dropped his cell phone near the intersection of 19th Street and Capp Street, and threw his gun into a compost bin in a parking lot on Capp Street.

Police officers who arrived to investigate the crime scene quickly located the cell phone Mejia-Carrillo had dropped and the .380 caliber handgun he had discarded. They also retrieved two freshly smoked cigarette butts, a wallet (which turned out to be Christian's), and some bloody clothing. Surveillance videos obtained from the Beauty Bar and neighboring businesses depicted the events before the shooting and Mejia-Carrillo's flight afterwards. Patrol officers from the Mission District identified Mejia-Carrillo and Cruz-Zepeda from surveillance video taken inside the Beauty Bar. The

---

[5] In closing argument, the prosecutor asked the jury to infer that Martinez was targeted by Elmer Rodriquez, who he referred to as "Gordo": "Here we have Elmer Gordo, the man who both of these guys [Mejia-Carrillo and Cruz-Zepeda] were talking to before Martinez was killed."

6

officers also identified Mejia-Carrillo in "selfie" photographs stored in the recovered cell phone.

The police arrested the defendants on March 21, 2017. They obtained a sample of Mejia-Carrillo's DNA using a mouth swab.

Although neither the cell phone nor the gun contained fingerprints, a criminalist employed by the Department of Justice used new software called STRmix to establish to a high degree of probability that both items contained Mejia-Carrillo's DNA. Based on tool mark analysis of the gun and the spent cartridges, a criminalist opined that the gun Mejia-Carrillo discarded in the compost bin was used to kill Martinez.

As discussed above, Sergeant Trujillo testified that defendants were members of the 20th Street clique of the M.S. 13 criminal street gang. He explained that the M.S. 13 gang often sends a lookout to assist with a gang check because "[a]ny time a gang check is going to occur there is going to be violence involved." After reviewing video evidence of Cruz-Zepeda's conduct outside the Beauty Bar, Trujillo opined that Cruz-Zepeda's actions were consistent with acting as a gang lookout. Trujillo testified that Cruz-Zepeda's actions benefited the gang because he assisted Mejia-Carrillo in killing a perceived rival, thus avoiding a possible rival gang member intruding onto 20th Street territory. Additionally, a shooting in public enhanced the gang's reputation because it reminded the public that "the gang is violent and if need be that they will commit acts of violence against people in their territory."

The prosecution was required to present evidence of two predicate offenses to support its contention that Mejia-Carrillo was acting for the benefit of, at the direction of, or in association with a criminal street gang in violation of section 186.22, subdivision (b)(1), when he killed Martinez, and

7

that Cruz-Zepeda, who aided Mejia-Carrillo by acting as a lookout, was involved in a gang conspiracy in violation of section 182.5. The parties stipulated that (1) Mejia-Carrillo committed and was convicted of assault with force likely to cause great bodily injury on November 10, 2016; and (2) Jose Tercero Perez committed and was convicted of a robbery on January 26, 2016.

### (2) Jury Instructions Pertaining to Gang Offenses and Enhancements

The jury was instructed with CALCRIM No. 1401, which defines a felony committed for the benefit of a criminal street gang, and CALCRIM No. 1402, which defines the gang-related firearm enhancement. The parties drafted an instruction[6] defining gang conspiracy, given that CALCRIM did not include an instruction for a violation of Penal Code section 182.5. The instruction incorporated by reference CALCRIM No. 1401's definitions of "criminal street gang" and "pattern of criminal gang activity." It instructed the jury that "[f]elonious criminal conduct means the murder of Jorge Martinez[7] in violation of [section] 187 as charged in count I of the information."

### (3) Juror Misconduct

The jurors were instructed throughout the trial that they must not discuss the case with anyone, not even other jurors, unless all jurors were present and the jury was deliberating in the jury room. The trial court specifically instructed the alternate jurors that they should not talk to

---

[6] Although the parties stipulated to use of the instruction, the defense reserved certain objections, particularly, whether the prosecution could use the homicide charged in this case to prove Cruz-Zepeda's felonious conduct.

[7] At trial, the victim was referred to as George Martinez, or occasionally as Jorge Martinez.

8

deliberating jurors about the case, or form or express an opinion about any issue in the case unless they were substituted in as deliberating jurors.

Late in the afternoon on Monday, December 16, 2019, the jury was escorted to the jury room to begin deliberations and the four alternate jurors left the courthouse. A few minutes later, an alternate juror who identified herself as "alternate #4"[8] sent a group text message to Jurors Nos. 5, 9, 11, and two alternate jurors stating: "Can you let us know when a verdict is reached. So we can come back to be present?" One of the alternate jurors immediately removed herself from the group text.

The next morning, December 17, 2019, the trial court substituted an alternate juror for a juror who had fallen ill and instructed the jury to begin deliberations anew. The jury thereafter deliberated the remainder of the day on Tuesday, and all day on Wednesday, December 18.

On Wednesday evening at 6:17 p.m., Juror No. 11 replied to the text message which Alternate Juror No. 4 had sent on Monday afternoon, stating: "Hi [Alternate Juror No.4], it's [Juror No. 11]—I think we are getting close to reaching a verdict. I think it will happen tomorrow. I will keep you updated." The following text messages were thereafter sent and received by the jurors and alternate jurors on the group text thread:

"[Alternate Juror No. 4] Ok thank you for the update! I am shocked it is taking this long. Really appreciate it.

"[Juror No. 11] You have no idea—I'm absolutely exhausted.

"[Alternate Juror No. 4] Oh I bet. Hang in there.

"[unknown alternate] Haha. Thanks for letting us know.

---

[8] "Alternate #4" is also referred to in the trial transcripts as Juror No. 17, Juror No. 18 and 4938745. For consistency, we refer to this alternate juror as Alternate Juror No. 4.

"[Alternate Juror No. 4] It's a sad situation on all parts but they are guilty in my opinion point blank.

"[Juror No. 11] It's just been such a long trial.

"[Alternate Juror No. 4] Yea. There really is no defense but they did the best they could with what they had."

The trial court was informed on Thursday morning that Juror No. 9 had left a phone message the previous evening asking to speak with the court "first thing tomorrow morning." Juror No. 11 told the bailiff that she also wished to speak to the judge. The court directed the jurors to state their requests in writing. The court thereafter received a note signed by three jurors which asked to speak privately with the judge "about an incident that occurred." When the court requested more information, it received the following three notes:

Juror No. 11: "Last evening I sent a group text to some of the alternate jurors on the trial. This text was to let the alternate jurors know that we may be close to reaching a verdict as they wanted to be in the courtroom for the verdict. One of the alternate jurors responded with a text that made me very uncomfortable. It is with regret that I sent the initial text. NO info re: verdict was given."

Juror No. 5: "There were text messages sent in a group thread with myself and a couple other jurors as well as a couple alternate jurors. I received messages on this thread relaying that the jury expected to reach a verdict in the next couple days. In response in the group thread, an alt juror expressed an opinion on the verdict."

Juror No. 9: "I would like to relay some information that is relevant to the trial to the judge. This is the same matter that jurors #5 and #11 are writing notes about."

Upon review of the juror notes, the trial court instructed the jury to stop deliberating. The court then interviewed each of the sitting jurors, beginning with Juror No. 11. The court advised the jurors not to volunteer information about jury deliberations or a possible verdict. After asking initial questions of each juror, the court offered the prosecutor and each defense attorney the opportunity to question each juror. Neither the prosecutor nor defense counsel asked any questions.

Juror No. 11 explained that she and Jurors Nos. 5 and 9 were part of a text string that included two alternates. When she received a text from an alternate which "discussed the case," Juror No. 11 "was immediately uncomfortable" and "completely disengaged from any further text." She assured the court that the content of the text messages would not influence her verdict. When interviewed by the court, Jurors Nos. 9 and 5 confirmed that they had reviewed the text messages, but stated clearly that they would not consider the alternate's opinion in reaching their verdicts. The court then interviewed the remaining jurors, none of whom had read the text messages in question. Most of the jurors who were not on the text string told the court that they learned of the existence of the text string that morning; some were aware that Juror No. 11 "felt terrible" and was worried that she had made a "grievous error." All 12 of the jurors assured the court that they could be impartial, and that the text message incident would not influence their verdict. When the interviews concluded, the court asked Juror No. 11 to return to court with her cell phone so that the court could make a record of the content of the messages and who received them.

After completing its investigation, the trial court instructed all jurors shortly before noon to disregard anything that they heard when court was not in session and released them to continue deliberating.

11

### (4)  Defendants' Motions for a Mistrial

Outside the presence of the jury, Mejia-Carrillo "presumptively" moved for a mistrial, which the court "tentatively denied."  The court indicated "[a]t this time I think we have a complete record as to what has occurred.  And the three that are involved, they actually brought it to the court's attention which is also—they understand their duty, their duty to abide by the court's admonition and they thought they may have breached that.  Given that they brought this to the court's attention, they all understand they have to reach their own independent evaluation in this case and maybe someone who expressed an opinion to them doesn't mean they read it but what they all assured us is that it's not going to affect their opinion especially when it appears they were close to verdicts in this case.  So that is the record."

After the lunch recess, counsel for Mejia-Carrillo renewed the motion for a mistrial, and counsel for Cruz-Zepeda joined.  In the alternative, counsel for Mejia-Carrillo requested that the court replace Juror No. 11 with Alternate Jurors Nos. 15 or 16, "the one that immediately got off the email chain."  Counsel reminded the court that several jurors had violated the court's repeated admonition that they were not to discuss the case with anyone, not even other jurors, unless they were in the jury room and all jurors were assembled.  He argued that the defendant's right to an impartial jury was violated when an alternate informed three of the deliberating jurors that she thought the defendants were guilty.  Counsel noted that "we've had varying levels of what people are owning to what they saw, but it's clear that the messages were sent, Your Honor, and is far broader and deeper in scope than we were led to believe."  Although he had initially requested the replacement of Juror No. 11 as an alternative to a mistrial, counsel for Mejia-Carrillo concluded that a mistrial was required because there were an

insufficient number of alternate jurors "untainted by the conversations" to substitute for the three affected jurors.

The trial court recognized that the jurors' group text constituted misconduct and explained that "[o]nce there is juror misconduct it is incumbent upon the People to show that the misconduct had not prejudiced the defendants in this case." The court found the three jurors who had participated in the text string to be "very forthcoming and honest in saying that they saw the text message and didn't try to hide it." "Juror No. 11 said she actually stopped the text after that inappropriate comment," and none of the jurors had responded to the alternate's opinion, which the court thought was "important." Additionally, "all three jurors informed [the court] that they could make their opinion based on the evidence in this case [and] would not be affected by any outside extraneous information."

The prosecutor pointed out that Jurors Nos. 11 and 9 had immediately and proactively tried to communicate with the court about the misconduct, which "weighs in favor of there being no prejudice here or bias." He described Juror No. 11 as "look[ing] very remorseful" as she described the text messages to the court. Citing *People v. Merriman* (2014) 60 Cal.4th 1 (*Merriman*), the prosecutor argued that the correct test was whether, "after considering the entire record including the nature of the misconduct and its surrounding circumstances that there is no substantial likelihood that the juror in question was actually biased against the defendant." Here, he argued, the presumption was rebutted by the affected jurors' "direct responses" that they would not consider the alternate's opinion in reaching their verdict.

Counsel for Mejia-Carrillo replied that he had "strong reservations that—about going forward with the verdict in light of this particular

information and in light of how many jurors knew it and without being in the dark with respect to the context of the deliberations with the people who have been holding out as to the issue of guilt." The court responded that "[w]e don't know which way their verdicts are going to be but it appears that [Juror No. 11] expected there was going to be a conclusion to this case. So that is a factor."

The court denied the defendants' motions for a mistrial, finding that "based on the observations from the answers from the jurors, the way the jurors reported it and also their lack of response to the text message regarding this information," there was not a substantial likelihood that the text messages would affect the jury's verdict.

### (5) Verdict

The jury reached a verdict later that afternoon. As explained above, Mejia-Carrillo was convicted of being a felon in possession of a firearm, first degree murder, and enhancements for personal discharge of a firearm causing death and commission of the murder in association with, for the benefit of, or at the direction of a criminal street gang. Cruz-Zepeda was convicted of gang conspiracy.

## B. Denial of Motion for a New Trial and Sentencing

Mejia-Carrillo moved for a new trial based on the jury misconduct, and Cruz-Zepeda joined in the motion. After separate hearings, the trial court denied each defendant's motion for a new trial.[9]

---

[9] Cruz-Zepeda also argued that he was entitled to a new trial because his conviction for violating section 182.5 was not supported by substantial evidence, and because the jury instruction which outlined the elements of gang conspiracy failed to adequately instruct the jury what "active" and "participation" meant. Cruz-Zepeda does not raise these arguments on appeal. Cruz-Zepeda's motion was heard on November 19, 2020. Mejia-Carrillo's motion was heard on January 28, 2021.

On November 19, 2020, the court sentenced Cruz-Zepeda to a term of 25 years to life.

On May 13, 2021, the court sentenced Mejia-Carrillo to an aggregate term of 60 years to life, which included a term of 25 years to life for first degree murder (count 1), a consecutive 25-year-to-life term for personal discharge of a firearm causing death, and a consecutive 10-year term for the gang enhancement pursuant to section 186.22, subdivision (b)(1)(C). The court imposed an aggravated three-year sentence for being a felon in possession of a firearm (count 2), to be served concurrent to count 1.[10]

Both defendants filed timely appeals from the judgments.[11]

## DISCUSSION

### I.

### *The Trial Court Acted Within Its Discretion in Denying Defendants' Motions for a Mistrial and For a New Trial Based on Jury Misconduct*

#### A. Standard of Review

"A trial court should grant a motion for mistrial 'only when " 'a party's chances of receiving a fair trial have been irreparably damaged' " ' [citation], that is, if it is 'apprised of prejudice that it judges incurable by admonition or

---

[10] The trial court also sentenced Mejia-Carrillo to serve eight months (one-third of the two-year mid-term) on count 3, apparently forgetting that count 3 had been dismissed. This mistake was corrected before the abstract of judgment was filed on May 13, 2021.

[11] Cruz-Zepeda filed a notice of appeal from the judgment on January 6, 2021. Mejia-Carrillo filed a notice of appeal on January 29, 2021. The Attorney General states that it is unclear from the record whether Mejia-Carrillo was sentenced on January 28, 2021, or May 13, 2021. On June 24, 2021, this court ordered that the notice of appeal filed on January 29, 2021, would be deemed as having been timely filed on May 13, 2021. The Attorney General does not dispute the timeliness of Mejia-Carrillo's appeal.

15

instruction.' [Citation.] 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' [Citation.] Accordingly, we review a trial court's ruling on a motion for mistrial for abuse of discretion. [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 573.)

"A new trial may be granted when a jury receives any evidence out of court other than a view of the scene or if the jury has engaged in misconduct which has prevented fair and due consideration of the case. (§ 1181, subds. 2 & 3.)" (*People v. Hayes* (1999) 21 Cal.4th 1211, 1255.) "Jury misconduct serious and extensive enough to impair the fairness of the trial or deliberations may warrant granting a new trial motion." (*People v. Flinner* (2020) 10 Cal.5th 686, 755.) "When the motion [for a new trial] is based upon juror misconduct, the reviewing court should accept the trial court's factual findings and credibility determinations if they are supported by substantial evidence[.]" (*People v. Dykes* (2009) 46 Cal.4th 731, 809 (*Dykes*).) "Whether prejudice arose from juror misconduct, however, is a mixed question of law and fact subject to an appellate court's independent determination." (*People v. Nesler* (1997) 16 Cal.4th 561, 582; *In re Carpenter* (1995) 9 Cal.4th 634, 646.)

## B. Law Governing Juror Misconduct

"A criminal defendant's constitutional right to due process of law includes the right to a trial by an impartial jury. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16; *Irwin v. Dowd* (1961) 366 U.S. 717, 722; *In re Hamilton* [(1999)] 20 Cal.4th 273, 293.) 'In a criminal case, any private communication, contact, tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . [and] the burden rests heavily upon the Government to establish . . . that such contact with the juror was harmless to

the defendant.' (*Remmer v. United States* (1954) 347 U.S. 227, 229; see *In re Hamilton, supra*, at p. 295 ['a nonjuror's tampering contact or communication with a sitting juror . . . usually raises a rebuttable "presumption" of prejudice'].) But 'it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote,' and 'due process does not require a new trial every time a juror has been placed in a potentially compromising situation.' (*Smith v. Phillips* (1982) 455 U.S. 209, 217.) Rather, '[a]ny presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant.' (*In re Hamilton, supra*, at p. 296.)" (*In re Price* (2011) 51 Cal.4th 547, 559–560.)

## C. The Trial Court Conducted an Adequate Inquiry Which Confirmed That Jury Misconduct Had Occurred

" 'When a trial court is aware of *possible* juror misconduct, the court "must 'make whatever inquiry is reasonably necessary to resolve the matter.' " (*People v. Prieto* (2003) 30 Cal.4th 226, 274.) "Although courts should promptly investigate allegations of juror misconduct 'to nip the problem in the bud' (*People v. Keenan* (1988) 46 Cal.3d 478, 532), they have considerable discretion in determining how to conduct the investigation." (*Prieto*, at p. 274.) The California Supreme Court has stated: "[I]t is within the trial court's discretion to determine whether and when to hold an evidentiary hearing on [juror misconduct] allegations. If the judge orders an investigative hearing, it is within his discretion to determine its extent and nature. [Citations.] As a matter of common sense, a trial judge in making these decisions will necessarily be directed by the content of the allegations,

including the seriousness of the alleged misconduct or bias, and the credibility of the source.' " (*Dykes*, *supra*, 46 Cal.4th at p. 809, fn. 23, citing *United States v. Hendrix* (9th Cir. 1977) 549 F.2d 1225, 1227–1228, fn. omitted; *United States v. Shryock* (9th Cir. 2003) 342 F.3d 948, 973.) Where, as here, the allegations of juror misconduct arise during jury deliberations, the court should take care to " 'assure[] the privacy of jury deliberations by foreclosing intrusive inquiry into the sanctity of jurors' thought processes.' [Citation.]" (*In re Hamilton*, *supra*, 20 Cal.4th at p. 294, fn. 17.)

Cruz-Zepeda contends that the trial court's inquiry was inadequate in several respects, namely: (1) the trial court did not ask Jurors Nos. 5, 9, or 11 why the group text was created; (2) it failed to interview the alternate jurors who participated in the group texts; (3) it did not physically review the cell phone of each juror and alternate who participated in the group texts; and (4) the court did not adequately interrogate the jurors regarding their ability and willingness to follow the court's instructions. He further asserts that the court should have asked the jurors questions such as, "how many, if any, votes the jury had taken and, if they had taken any, what the numeric breakdown was." Mejia-Carrillo alleges that the inquiry was improper because the court elicited and relied upon the jurors' subjective reasoning in violation of Evidence Code section 1150.[12]

---

[12] Evidence Code section 1150, subdivision (a) provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

As an initial matter, we note that neither defendant objected to the adequacy or appropriateness of the inquiry in the trial court. "All issues . . . are subject to the rule of forfeiture, and a defendant's failure to raise the issue before the trial court will generally result in the appellate court's refusal to consider it." (*People v. Navarro* (2013) 212 Cal.App.4th 1336, 1347, fn. 9; *People v. Trujillo* (2015) 60 Cal.4th 850, 856.) Here, the trial court offered defense counsel the opportunity to question the jurors about the misconduct and both declined to do so. When the trial court stated during the hearing on the motion for a mistrial, "[a]ctually, I don't think I'm doing any more inquiry," neither defendant suggested that further inquiry was necessary. When it announced "[a]t this time we have a complete record as to what has occurred," neither defendant objected. Finally, neither defendant claimed in his motion for a new trial[13] that the trial court's inquiry into the misconduct was inadequate or violated Evidence Code 1150, subdivision (a). Accordingly, we conclude that the defendants have forfeited their claims that the inquiry into juror misconduct was inadequate or inappropriate.

Even if the issues had not been forfeited, neither issue is meritorious.

---

[13] In arguing his motion for a new trial, counsel for Mejia-Carrillo indirectly challenged the adequacy of the court's investigation when he claimed that the court had improperly denied his request to poll the jury on where they stood on the issue of defendants' guilt. The record does not support counsel's claim. In fact, neither defense counsel asked the court to poll the jurors on the number of votes they had taken on the issue of defendants' guilt in connection with the motion for a mistrial. Counsel for Mejia-Carrillo merely asserted that he had "strong reservations . . . about going forward" in light of Alternate Juror No. 4 expressing an opinion about the defendants' guilt and without knowing whether there were any "hold outs" on the jury. Counsel's expressed "reservation" cannot be construed as a request to conduct a jury poll as part of the inquiry into judicial misconduct.

Cruz-Zepeda compares the trial court's inquiry in this case to *People v. McNeal* (1979) 90 Cal.App.3d 830, a case in which the jury foreperson advised the court during deliberations that a juror "has some personal knowledge that was brought about from the testimony of the last defense witness . . . [which] definitely had a bearing on the way she will vote," and the court thereafter declined to conduct a factual inquiry, as required by section 1120,[14] to determine whether good cause existed to discharge the juror. (*Id.* at pp. 835–836.) Here, unlike *McNeal,* none of the jurors had or received factual information outside of the evidence presented at trial. Additionally, *McNeal* acknowledges that "[w]hile a hearing with sworn testimony is required by section 1120, it appears that a less formal inquiry is adequate to determine 'good cause' to discharge a juror under other circumstances." (*McNeal*, at p. 837.)

Citing *People v. Burgener* (1986) 41 Cal.3d 505, 519, Cruz-Zepeda argues that even when section 1120 is not implicated, "an inquiry sufficient to determine the facts is required whenever the court is put on notice that good cause to discharge a juror may exist." Here, the court conducted such an inquiry: it determined that Jurors Nos. 5, 9, and 11 were involved in the misconduct, made a complete record of the text messages which the jurors were inappropriately exposed to, and stated the reasons for its decision that none of the jurors should be discharged. Cruz-Zepeda faults the court for

---

[14] Section 1120 states: "If a juror has personal knowledge respecting a fact in controversy in a cause, he or she must declare the same in open court during the trial. If, during the retirement of the jury, a juror declares a fact that could be evidence in the cause, as of his or her own knowledge, the jury must return into court. In either of these cases, the juror making the statement must be sworn as a witness and examined in the presence of the parties in order that the court may determine whether good cause exists for his or her discharge as a juror."

failing to inquire "whether the jurors would continue to deviate from the court's order and instructions." Such an inquiry was not required, given the court's finding that Jurors Nos. 5, 9, and 11 understood their duty based on their self-report of the misconduct, their decision not to respond to Alternate Juror No. 4 or further disseminate her opinions, Juror No. 11's expression of remorse, and each juror's promise to properly discharge his or her duty going forward. Additionally, the court reinforced the importance of the jury disregarding information received outside the courtroom by rereading CALCRIM No. 222 to the entire jury. In short, the court's inquiry was adequate in light of " 'the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source.' " (*Dykes, supra,* 46 Cal.4th at p. 809, fn. 23.)

Mejia-Carrillo argues that the court improperly elicited evidence which invaded the jury's mental processes in violation of Evidence Code section 1150. He contends that the court erred when it asked some of the jurors if they could put aside their knowledge of the existence or content of the text messages and decide the case based on the evidence received at trial. We agree that Evidence Code section 1150 precludes a court from relying on a juror's declaration or testimony which disclaims that information improperly received outside of court influenced that juror's verdict (*People v. Adame* (1973) 36 Cal.App.3d 402, 404–405; *People v. Pierce* (1979) 24 Cal.3d 199, 207–208; *People v. Holloway* (1990) 50 Cal.3d 1098, 1111), but conclude the inquiry conducted in this case did not violate Evidence Code section 1150.

Unlike *Adame, Pierce,* or *Holloway,* here the court did not conduct a postjudgment inquiry into jury misconduct, so Evidence Code section 1150 is not directly applicable. Even so, the trial court recognized the importance of protecting the deliberative process. It conducted a limited scope investigation

21

"to avoid intruding unnecessarily upon the sanctity of the jury's deliberations." (*People v. Cleveland* (2001) 25 Cal.4th 466, 485.) The court told the jurors prior to questioning that they must not divulge any information about deliberations, and each juror complied with this directive. The court asked the jurors whether they could set aside whatever they may have read or heard about the text messages and reach an impartial decision based on the evidence received at trial. This is different than asking, after a verdict has been rendered, if evidence outside the trial has influenced a juror's decision (see, e.g., *People v. Pierce*, *supra*, 24 Cal.3d at p. 208), and more akin to the court instructing jurors that they must not rely on information they have received outside the courtroom in rendering their verdict. We conclude that the inquiry did not violate Evidence Code section 1150.

### D.  The Error is Not Reversible Per Se

Mejia-Carrillo asserts that the facts found in the misconduct inquiry are "virtually identical" to the facts in *Parker v. Gladden* (1966) 385 U.S. 363 (*Parker*), and that, as in *Parker*, the misconduct was so serious that "no possible means exist to dispel [the prejudice]," rendering the error reversible per se. *Parker* is factually distinguishable, and we reject the premise that the error is reversible per se.

In *Parker*, a defendant convicted by jury of second degree murder filed a petition for postjudgment relief which raised issues of juror misconduct. (*Parker*, *supra*, 385 U.S. at p. 363.) At the hearing on the petition, the trial court found that a bailiff assigned to accompany the sequestered jury had "stated to one of the jurors in the presence of others, while the jury was out walking on a public sidewalk:  'Oh that wicked fellow [petitioner], he is guilty'; and on another occasion said to another juror under similar

22

circumstances, 'If there is anything wrong [in finding petitioner guilty] the Supreme Court will correct it.' Both statements were overheard by at least one regular juror or an alternate." (*Id*. at pp. 363–364, fns. omitted.) The United States Supreme Court rejected the state's argument that the petitioner had suffered no prejudice as a result of the juror misconduct. (*Id*. at pp. 364, 365.) The high court noted that the opinion volunteered by "the bailiff—as an officer of the court as well as the State—beyond question carries great weight with a jury which he had been shepherding for eight days and nights." (*Id*. at p. 365.) "Moreover, the jurors deliberated for 26 hours, indicating a difference among them as to the guilt of the petitioner. Finally, one of the jurors testified that she *was* prejudiced by the statements[.]" (*Ibid*., fns. omitted.)

In contrast, approximately 11 hours into the deliberations in this case, Juror No. 11 sent a group text expressing her belief that the jury was close to reaching a verdict and that she thought "it will happen tomorrow." Alternate Juror No. 4 responded that she was surprised the jury was taking so long to reach a verdict because, in her view, the defendants were guilty. The alternate juror who expressed the opinion was not an officer of the court. Unlike *Parker,* the court's inquiry did not establish a substantial likelihood that one or more jurors were "actually biased" against the defendants. (*Parker, supra,* 385 U.S. at p. 365; *In re Carpenter*, *supra*, 9 Cal.4th at p. 654.) Additionally, the United States Supreme Court found that the prejudice to the defendant was "extreme" and had not been rebutted by the state (*Parker*, at p. 365), not that the error was reversible pe se.[15]

_____

[15] It is well settled in California that "jury misconduct in receiving evidence outside of court" "is not per se reversible." (*People v. Martinez* (1978) 82 Cal.App.3d 1, 22.) Defendants cite *People v. Adame, supra*, 36 Cal.App.3d at pages 406–408, which held that an alternate's presence in the

### E. The Presumption of Prejudice Was Rebutted

As stated above, we independently review the nature of the misconduct and the surrounding circumstances, taking into account the trial court's credibility determinations and factual findings which are supported by substantial evidence, in order to determine whether the presumption of prejudice has been rebutted. (*Merriman*, *supra*, 60 Cal.4th at p. 87.) "A judgment adverse to the defendant in a criminal case must be reversed or vacated 'whenever . . . the court finds a substantial likelihood that the vote of one or more jurors was influenced by exposure to prejudicial matter relating to the defendant or to the case itself that was not part of the trial record on which the case was submitted to the jury.' " (*People v. Marshall* (1990) 50 Cal.3d 907, 950–951.) " 'The ultimate issue of influence on the juror is resolved by reference to the substantial likelihood test, an objective standard. In effect, the court must examine the extrajudicial material and then judge whether it is inherently likely to have influenced the juror.' " (*People v. Holloway*, *supra*, 50 Cal.3d at p. 1109.)

In *Merriman*, *supra*, 60 Cal.4th at page 87, the court found that a juror initiated a phone conversation during deliberations with Deputy Baker, whom she considered an extended family member. "Deputy Baker said something to the effect that she hoped the jury would put defendant away.

---

jury room during deliberations was an invasion of the defendant's right to trial by jury and was reversible per se. The case is clearly distinguishable on its facts. Moreover, *Adame* expressly relied on *People v. Britton* (1935) 4 Cal.2d 622 and *People v. Bruneman* (1935) 4 Cal.App.2d 75, both of which were subsequently disapproved by the California Supreme Court in *People v. Valles* (1979) 24 Cal.3d 121 [presence of an alternate in the jury room during deliberations was not necessarily detrimental to a defendant's right to trial by jury and defense counsel may stipulate to this procedure]. Appellants cite no other authority for the proposition that juror misconduct based on receiving information outside of court is reversible per se.

Juror No. 1 responded to Deputy Baker's comment by saying that defendant 'would be put away one way or the other,' and the [trial] court found it 'highly likely' she added that she expected a death verdict[.]" (*Id.* at p. 98.) Noting that the conversation between Juror No. 1 and Deputy Baker constituted serious misconduct, the court nevertheless found that the presumption of prejudice had been rebutted because (1) Juror No. 1's telephone call had not been for an improper purpose, such as a desire to discuss the case; (2) Deputy Baker's "provocative statement" was unsolicited; (3) Juror No. 1's response predicting the death penalty was "off-the-cuff," and there was no further conversation about the case; and (4) Juror No. 1 "remained open-minded and able to vote either way on the murder count and special circumstance allegations." (*Id.* at pp. 93–94.)

In *People v. Danks* (2004) 32 Cal.4th 269, 309, a juror deliberating in a death penalty case asked her pastor, "Is there anything in the Bible which speaks against the death penalty?" The pastor responded that if he was in the juror's shoes, he would not hesitate to give the defendant the death penalty. (*Id.* at p. 309.) The California Supreme Court acknowledged the misconduct, yet found it was not prejudicial because the unsolicited opinion offered by the pastor was not "inherently and substantially likely to influence [the juror]." (*Id.* at pp. 308–309.)

Like *Merriman* and *Danks*, this case involves unauthorized communication between deliberating jurors and a nonjuror who offered an unsolicited opinion regarding the defendant's guilt. Here the trial court found that all three jurors recognized that receiving and reviewing the alternate's text messages violated the court's instructions, self-reported the issue to the court, and did not respond to the alternate's unsolicited opinion or share it with other jurors. The court also found that Juror No. 11 realized

25

the situation was serious, stopped reading the alternate's message, and felt remorseful for participating in the text string. Each of the court's factual findings is supported by substantial evidence in the record. We conclude that the totality of the circumstances—the opinions expressed by Alternate Juror No. 4, and the jurors' reactions upon receiving them—supports a finding that the information was not substantially likely to influence the jurors.

We reach the same conclusion regarding the text in which Alternate Juror No. 4 expressed her shock that the jury's deliberations were taking so long. Mejia-Carrillo argues that this text may have resulted in a rush to judgment or stigmatized hold-out jurors. Given that the jury deliberated approximately 11 hours before the misconduct came to light, Mejia-Carrillo argues that the case must have been "close," rendering Alternate Juror No. 4's comment extraordinarily prejudicial. We are not persuaded that the length of deliberations alone supports an inference that, in the absence of the misconduct, the jury might have hung or acquitted on the charges and enhancements against either defendant. Here, Juror No. 11 notified two jurors and two alternates on Wednesday night that, in her opinion, the jury was "getting close to reaching a verdict," and she thought it would "happen tomorrow." Given the speed with which the jury reached its verdict after the misconduct inquiry concluded, the more reasonable inference to be drawn from the evidence is not that one or more hold-out jurors felt rushed or stigmatized, but that Juror No. 11's prediction that the jury would reach a verdict on Thursday because they were already "close" was correct. The fact that the jury was polled immediately after the verdict, without any juror expressing concern or hesitation when asked to verify his or her verdict, supports this conclusion.

26

## II.

### *The Postjudgment Enactment of Assembly Bill 333 Requires the Reversal of Cruz-Zepeda's Conviction for Gang Conspiracy and the True Finding on Mejia-Carrillo's Gang Enhancement*

#### A. Effective January 1, 2022, Assembly Bill 333 Amended Definitions Which Are Integral to the Elements of the Gang Enhancement (§ 186.22, subd. (b)) and the Offense of Gang Conspiracy (§ 182.5)

" 'In 1988, the Legislature enacted the California Street Terrorism Enforcement and Prevention Act (STEP Act; § 186.20 et. seq.) to eradicate criminal activity by street gangs." ' [Citation.] Among other things, the STEP Act created 'a sentencing enhancement for a felony committed "for the benefit of, at the direction of, or in association with any criminal street gang" (§ 186.22, subd. (b)(1)).' [Citation.]" (*People v. Tran* (2022) 13 Cal.5th 1169, 1205–1206 (*Tran*).) The purpose of the STEP Act was to increase punishment for defendants who commit felonies in furtherance of criminal street gang activity. (*People v. Fuentes* (2016) 1 Cal.5th 218, 223.)

As relevant to these proceedings, the STEP Act was amended in 2000 by the voters in an initiative measure known as Proposition 21. (*People v. Lopez* (2022) 82 Cal.App.5th 1, 10 (*Lopez*), review denied; *People v. Johnson* (2013) 57 Cal.4th 250, 261.) "[S]ection 3 of Proposition 21 added the gang conspiracy statute (§ 182.5) to the Penal Code. (Voter Information Guide, Primary Elec. (Mar. 7, 2000) text of Prop. 21, § 3, p. 119)." (*Lopez*, at p. 17.)

"In 2021, the Legislature passed Assembly Bill 333 (2021–2022 Reg. Sess.) . . . , which became effective on January 1, 2022." (*Tran, supra*, 13 Cal.5th at p. 1206.) Assembly Bill 333 made several amendments to section 186.22, subdivisions (e) and (f) which are integral to the interpretation of the gang enhancement and the gang conspiracy statute. "First, it narrowed the definition of a 'criminal street gang' to require that

any gang be an 'ongoing, *organized* association or group of three or more persons.' (§ 186.22, subd. (f), italics added.) Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. (§ 186.22, subd. (f), italics added.) Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. (§ 186.22, subd. (e)(1), (2).) Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputation.' (§ 186.22, subd. (g).)" (*Tran*, *supra*, 13 Cal.5th at pp. 1206–1207.)

## B. Assembly Bill 333 Applies to the Gang Enhancement

Mejia-Carrillo argues on appeal, and the Attorney General agrees, that Assembly Bill 333 should be applied retroactively to the gang enhancement conviction in Mejia-Carrillo's case. *Tran* settled this issue when the Supreme Court held that the ameliorative provisions of Assembly Bill 333 apply retroactively to a defendant convicted of a gang enhancement defined in section 186.22, subdivision (b)(1), whose case was not final when Assembly Bill 333 was enacted. (*Tran*, *supra*, 13 Cal.5th at pp. 1206–1207.) "Assembly Bill 333 essentially adds new elements to the substantive offense

and enhancements in section 186.22—for example, by requiring proof that gang members 'collectively engage' in a pattern of criminal gang activity, that the predicate . . . and underlying offenses provided more than a reputational benefit to the gang[.]" (*People v. E.H.* (2022) 75 Cal.App.5th 467, 479.) "The proper remedy for this type of failure of proof—where newly required elements were 'never tried' to the jury—is to remand and give the People an opportunity to retry the affected charges." (*E.H.*, at p. 480; *Tran*, at pp. 1206–1207; *Lopez, supra*, 82 Cal.App.5th at p. 14).)[16] We thus reverse and remand the true finding on the gang enhancement as to Mejia-Carrillo.

## C. Assembly Bill 333 Applies to Gang Conspiracy

The California Constitution provides that a statute adopted by voter initiative may be amended "only when approved by the electors unless the initiative statute permits amendment or repeal without the electors' approval." (Cal. Const., art. II, § 10, subd. (c); *People v. Superior Court* (2010) 48 Cal.4th 564, 568 (*Pearson*).) Proposition 21 expressly states that it can be amended by the Legislature only upon a two-thirds vote (Prop. 21, § 39; *People v. Rojas* (2022) 80 Cal.App.5th 542, 550 (*Rojas*), review granted Oct. 19, 2022, S275835; *Lopez, supra*, 82 Cal.App.5th at pp. 17–18.) "There is no dispute that Assembly Bill 333 'was enacted without voter approval, and without the requisite two-thirds votes in both houses of the Legislature.' " (*Lopez*, at p. 18; *People v. Lee* (2022) 81 Cal.App.5th 232, 240 (*Lee*), review granted Oct. 19, 2022, S275449.)

---

[16] Because we reverse the true finding on the gang enhancement, we need not reach Mejia-Carrillo's unopposed argument that the trial court erred in imposing a 10-year consecutive sentence for the gang enhancement pursuant to section 186.22, subdivision (b)(1)(C), rather than punishing pursuant to section 186.22, subdivision (b)(5), which requires a 15-year minimum parole eligibility term for life sentences.

In *Rojas*, *supra*, 80 Cal.App.5th at page 547, a divided panel of the Fifth District Court of Appeal, construing the special-circumstance murder enhancement (§ 190.2, subdivision (a)(22)) adopted by the voters as part of Proposition 21, held that Assembly Bill 333 could not alter the proof requirements for a "criminal street gang" from those in effect at the time the voters enacted Proposition 21. As the Attorney General acknowledges, the practical effect of *Roja's* approach is that "a special circumstance murder allegation under section 190.2[, subdivision] (a)(22) may be proven based on a different, less restrictive definition of a 'criminal street gang' than is found in the current version of section 186.22." (*Lopez*, *supra*, 82 Cal.App.5th at p. 15; *Rojas*, at p. 558, review granted.)

*Lopez*, *supra*, 82 Cal.App.5th at page 25, was the first case to address whether the amended definitions of "criminal street gang" and "pattern of criminal gang activity" in Assembly Bill 333 apply to the gang conspiracy statute which was adopted by voter initiative in Proposition 21. As in this case, the Attorney General argued in *Lopez* that "Assembly Bill 333's 'amendment to section 186.22, subdivisions (e) and (f), appears to be an unconstitutional amendment to the criminal street gang conspiracy offense created by the voters via Proposition 21.' " (*Lopez*, at p. 16.) The Attorney General took the position, as he does here, that "there are now two statutory definitions of a 'criminal street gang,' " and the references to section 186.22 subdivisions (e) and (f) in section 182.5 "must be read to mean *as the provisions existed prior to Assembly Bill 333.*" (*Lopez*, at p. 16.)

In *People v. Henderson* (2022) 14 Cal.5th 34, the California Supreme Court faced a similar issue of statutory construction, specifically, how to apply the provisions of voter-enacted Proposition 36, the Three Strikes Reform Act of 2012, to the Legislature's March 1994 codification of the Three

30

Strikes law in Penal Code section 667, subdivisions (b) through (i), and the parallel Three Strikes sentencing provision adopted by voter initiative in November 1994 as Penal Code section 1170.12. The California Supreme Court applied the following rules: " ' "In interpreting a voter initiative . . . , we apply the same principles that govern statutory interpretation." [Citation.] Where a law is adopted by the voters "their intent governs." [Citation.] In determining that intent, "we turn first to the language of the statute, giving the words their usual meaning." [Citation.] But the statutory language must also be construed in the context of the statute as a whole and the overall statutory scheme. [Citation.] We apply a presumption, as we similarly do with regard to the Legislature, that the voters, in adopting an initiative, did so being "aware of existing laws at the time the initiative was enacted." ' " (*Henderson*, at p. 50, quoting *People v. Buycks* (2018) 5 Cal.5th 857, 879–880; *People v. Raybon* (2021) 11 Cal.5th 1056, 1065.)

In interpreting the intent of the voters when they passed Proposition 21 and created the offense of gang conspiracy (§ 182.5), *Lopez* " 'scrutinize[d] the statute's words, assigning them their usual and ordinary meanings and construing them in the context of the overall statutory scheme.' " (*Lopez*, *supra*, 82 Cal.App.5th at p. 23.) The court compared section 182.5 to other provisions of Proposition 21, specifically the addition of section 667.1 and 1170.125 to the Penal Code, noting that in connection with those statutes the voters specified that "all references to existing statutes . . . are to those statutes *as they existed on the effective date of this act*[.]" (*Lopez*, at p. 24.) *Lopez* drew on the analysis in *Lee*, which had previously held Assembly Bill 333 did not unconstitutionally amend the gang-murder special-circumstance statute. (§ 190.2, subd. (a)(22).) *Lee* rejected the position that the voters intended to fix the definition of "criminal street gang" in section 190.2,

31

subdivision (a)(22) to the proof requirements in existence at the time Proposition 21 was enacted, finding "nothing to suggest that the electorate intended to impose a time-specific incorporation of the term 'criminal street gang' in the gang-murder special-circumstance statute," and therefore concluding that "the term 'criminal street gang' as incorporated in the gang-murder special-circumstance statute was 'intended to conform at all times' and 'remain permanently parallel' to section 186.22." (*Lee, supra,* 81 Cal.App.5th at p. 245, review granted, citing *Jovan B.* (1993) 6 Cal.4th 801, 816, fn. 10.) Agreeing with *Lee*'s conclusion that " 'the electorate clearly knew how to express the intent to freeze a statutory definition' " *Lopez* held, "The absence of time-specific language in section 182.5 leads to our rejection of the People's claim. [Citation.] . . . [Citations.] As there is no evidence compelling a different conclusion, we hold Assembly Bill 333's amendments to section 186.22, subdivisions (e) and (f) lawfully apply to section 182.5." (*Lopez,* at pp. 24–25.)

We agree with the statutory analysis in *Lee* and *Lopez* and conclude that Assembly Bill 333 applies retroactively to section 182.5. As the Attorney General does not argue that the prosecution presented evidence that would meet the new evidentiary requirements of section 186.22, subdivisions (e) and (f) as now incorporated into section 182.5, Cruz-Zepeda's gang conspiracy conviction must be reversed, and the matter remanded to allow the prosecution the opportunity to elect whether to retry the matter under current law.

## DISPOSITION

The true finding on the gang enhancement pursuant to section 186.22, subdivision (b)(1) against Mejia-Carrillo is reversed. In all other respects, the judgment as to Mejia-Carrillo is affirmed.

Cruz-Zepeda's conviction for violating section 182.5 (gang conspiracy) is reversed.

On remand, the district attorney may elect whether to retry the gang enhancement against Mejia-Carrillo and/or the charge of gang conspiracy under section 182.5 against Cruz-Zepeda. If the prosecution elects not to retry the gang enhancement against Mejia-Carrillo, he shall promptly be resentenced.

_____
Mayfield, J.*

We concur:

_____
Richman, Acting P.J.

_____
Miller, J.

*People v. Cruz-Zepeda and Mejia-Carrillo* (A161927 & A162077)


    * Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.